# CHARLES TOWN

### State v. Harden.

### Submitted June 7, 1907. Decided June 8, 1907.

62   313
62   436
62   510

62   313
66   179
66   504
66   613

1. Intoxicating Liquors—*License—Power of Municipal Authorities.*

   The power reserved to the legislature, by section 46 of Art. VI. of the Constitution of this State, to regulate or prohibit the sale of intoxicating liquors, sustains legislation, vesting in the councils of cities and towns sole power to grant or refuse state licenses for such sales within the corporate limits thereof. (p. 319.)

2. Same.

   So much of section 24 of Art. VIII, of the Constitution as commits to county courts the superintendence and administration of the internal police and fiscal affairs of their counties, under such regulations as may be prescribed by law, and provides that no license for sales of intoxicating liquors in any municipal corporation shall be granted without the consent of the municipal authorities, is operative, as to the jurisdiction to grant or refuse licenses for such sales, only so long and to such extent as the legislature, by committing to county courts such jurisdiction, makes the function a part of the police affairs of the counties. (p. 320.)

3. Statutes—*Construction.*

   In ascertaining the intention of the people in adopting a constitution all parts of the constitution must be considered, every article, section, clause, phrase and word allowed some effect, and all parts, clauses, phrases and words harmonized, if possible.

No part or word in it can be ignored, disregarded, treated as meaningless or denied purpose and effect, unless there be irreconcilable contradiction and repugnancy. (p. 321.)

4. INTOXICATING LIQUORS—*Regulation.*

As section 24 of Art. VIII, gives jurisdiction to county courts, under such regulations as may be prescribed by law, a construction, denying power in the legislature to withhold, or take, from them the power to grant or refuse licenses for the sale of intoxicating liquors, would render the word "regulating" in section 46 of Article VI, useless and ineffective of any purpose, contrary to a rule of interpretation, universally observed by courts. (p. 322.)

5. CONSTITUTIONAL LAW— *Construction by Legislature.*

A contemporaneous construction or interpretation, given to a constitution by the legislature, and acquiesced in by the the people and the courts for a long period of time, will not be disturbed or overthrown, unless it be plainly wrong. (p. 323.)

6. SAME—*Interpretation of Framers.*

In determining the meaning of a constitutional provision, the interpretation put upon it by its framers in drafting it. and the people in putting it into operation, as shown by existing conditions and laws, left undisturbed and expressly recognized and continued. ought to have great weight. (p. 323.)

7. STATUTES—*Construction—Repeal.*

A statute revising the whole subject matter of a former one, or a former series of statutes, becomes, by reason of its scope and purpose, to the full extent of the terms used and necessarily implied, the exclusive rule and law, governing the subject, and is, therefore, a substitute for the former statute or statutes, repealing such parts thereof as are inconsistent with the new act, and not a mere amendatory act, adding to or detracting from the former law. (p. 324.)

8. SAME.

The purpose of such a statute is the provision of a new, complete and comprehensive system of law for the government of its subject matter, and the method of drafting and passing it is not the erection, upon former laws as a substructure, of a mere superstructure, but the laying of new foundations and the erection of a new and complete structure, using only such of the old materials as are deemed suitable, so that the work consists, not of mere alteration and remodeling nor of exclusion, nor of the double process of exclusion and inclusion, but of inclusion only, by means of express and implied enactments and re enactments and express and implied adoptions of existing laws. (p. 328.)

9. SAME.

The language of such a statute, relating to a given subject within the scope and purpose of the act, is presumed to be the full and complete expression of the legislative will and intention, respecting that matter; and for the law on that subject resort cannot be had to other statutes, unless the language used is incapable of conveying any meaning or has expressly or impliedly adopted them. Statutes formerly in effect relating to the same matter are not considered as laws *in pari materia.* (p. 329.)

10. SAME—*Intent of Legislature.*

However awkward, informal and unusual the language of a statute may be, the legislative will and intention manifested by it must be ascertained by the court and enforced as the law. The intention expressed is paramount to form and must have the force of law. (p. 330.)

11. SAME.

Awkwardness, informality and terseness of expression in a statute cannot be imputed to incompetency or lack of wisdom on the part of the legislature, nor to the perpetration of fraud and trickery upon it. (p. 330.)

12. SAME—*Presumption.*

An interpretation of a statute or clause thereof which gives it no function to perform, and makes it a mere repetition of another clause, must be rejected as unsound, for it is presumed that the legislature had a purpose in using every word and clause found in a statute, and intended the terms used to be effective. (p. 333.)

13. SAME—*Ambiguity.*

Ambiguity in a statute or other instrument consists of susceptibility of two or more meanings and uncertainty as to which was intended. Mere informality in phraseology or clumsiness of expression does not make it ambiguous, if the language imports one meaning or intention with reasonable certainty. (p. 350.)

14. SAME—*Implications.*

That which is necessarily implied in a statute, or must be included in it in order to make the terms actually used have effect, according to their nature and ordinary meaning, is as much a part of it as if it had been delcared in express terms. (p. 352.)

15. INTOXICATING LIQUORS—*Licenses—Powers of Town.*

Tested by these well settled rules of interpretation and construction, section 35 of chapter 40 of the Acts of 1891, the declared and manifest object of which was the provision of a complete system of law for the government of the town of Point Pleasant, as shown by its title and enactments, reading as follows: ''The council shall prescribe, by ordinance, the manner in which licenses of all kinds

shall be applied for and granted, and it shall require the payment of the taxes thereon before delivery to the person applying therefor;" vests in the council of said town sole power to grant or refuse state as well as municipal licenses for the sale of intoxicating liquors.  (p. 346.)

16. SAME.

The language of said section is not ambiguous, but, if it were, it could mean nothing else, when read in the light of section 40 of the same act, showing knowledge on the part of the legislature of an alleged previous amendment made to the charter of said town purporting to confer such authority upon· the council in express terms.  (p. 350.)

17. STATUTES—*Construction.*

In seeking the meaning and intent of a statute, regard must be had to its subject matter and all the surrounding circumstances, known to the legislature.  ʹp. 350.)

18. SAME—*Presumptions.*

The legislature is presumed to have had full knowledge of the subject matter of statutes passed by it.  (p. 350.)

19. CONSTITUTIONAL LAW—*Legislative Powers.*

The province of the legislature is to make and repeal laws, not to determine what is, or has been, the law, for that is judicial action within the exclusive province of the courts.  (p. 351.)

20. STATUTES—*Construction—Presumptions.*

Courts will not presume that the legislature, in referring to all the amendments made to the charter of a town, did not take notice of one of them, because, since the passage of the act, making such reference, its validity has been denied, for it was not within the domain of legislative action and power to pass upon the question of its validity.  (p. 352.)

(McWHORTER and MILLER, Judges, dissenting.)

Error to Circuit Court, Mason County.

John Harden was convicted of an illegal sale of liquors, and brings error.

*Reversed.*

L. C. SOMERVILLE, W. R. GUNN, JOHN L. WHITTEN, HENRY M. RUSSELL, J. S. SPENCER, and MOLLOHAN, MC-CLINTIC & MATHEWS, for plaintiff in error.

CLARKE W. MAY, Attorney-General, L. S. ECHOLS, LACE MARCUM, and RANKIN WILEY, for the State.

POFFENBARGER, JUDGE:

Whether the defendant John Harden, had a valid license to sell, at retail, spirituous liquors, wine, porter, ale, beer and drinks of like nature, at the time he made the sale of liquor, charged in the indictment against him, as having been unlawfully made, is the sole question presented by this record. That he made a sale of liquor in the town of Point Pleasant, Mason county, West Virginia, within one year next preceding the finding of the indictment, is fully proven and not contested. Whether his license was valid or not, must be determined by the application, to the provisions of the charter of the town of Point Pleasant, which the defendant insists conferred upon the council of said town, sole authority and power to grant such licenses for such sales within the corporate limits of said town, of principles of law and settled rules of interpretation. The question is purely a legal one. It is in no sense a moral question or a question of public policy. It is to be determined solely by legal tests, and not by the personal views, opinions or preferences of anybody, assuming to speak for the general public. It is a question of what the legislature had the power to say and what it did say, as determined by rules of law. In construing statutes, courts have nothing to do with, and cannot consider, matters of public policy, moral justice or expedieny, except in so far as the legislature, by some language used in the statute, has evinced an intention to pursue or advance some particular policy. " Statutes cannot be declared invalid on the ground that they are unwise, or unjust, or unreasonable or immoral, or because opposed to public policy, or the spirit of the Constitution. Unless a statute violates some express provision of the Constitution it must be held to be valid. These principles are supported by numerous authorities, some of which are referred to in the margin," Lewis' Suth. Stat. Con., section 85, referring to probably seventy-five or one hundred decisions, including *Dewey* v. *United States*, 178 U. S. 510, in which Mr. Justice Harlan said, in reference to the duty of the Court: " Our province is to declare what the law is, and not, under the guise of interpretation or under the influence of what may be surmised to be the policy of the government, so to depart from sound

rules of construction as in effect to adjudge that to be law which Congress has not ·enacted as such," and further "of course our duty is to give effect to the will of Congress touching this matter, but we must ascertain that will from the words Congress had chosen to employ, interpreting such words according to their ordinary meaning, as well as in the light of all the circumstances that may fairly be regarded as having been within the knowledge of the legislative branch of the government at the time it acted on the subject." In *Brewer* v. *Blougher*, 14 Pet. 178, Chief Justice Taney said: "The expediency and moral tendency of this new law of inheritance is a question for the legislature of Maryland and not for this Court." Nor is this court at liberty to inquire into the motives of the legislators in voting for a law or to impeach the law on the ground of fraud or corruption, either at the suit of a private person or the state. Lewis' Suth. Stat. Constr., section 496; *Slack* v. *Jacob,* 8 W. Va. 612. It is conclusively presumed that the legislature has acted from pure motives and had wisdom enough to preclude their having been imposed upon or deluded into unwise legislation. From these rules and principles, no court can depart without violation of law, in deference to public clamor or for other purpose. Though every man in the State should demand of the Court that it annul a law or refuse to sustain it, because, in the estimation of the public, it is an unwise law, or an immoral law, the court could not comply with the demand. Their application must be made to the legislature, the only tribunal having power to grant such relief.

What I have said here, by way of preface to this opinion, is not intended as a reflection upon, or a criticism of, any of my associates, whose judgment has constrained them to differ from me, as to the conclusion and judgment in this case, or the grounds thereof. What I have thus said, has been superinduced by the wide public interest manifested in cases arising under the liquor laws of this State, of which the Court takes judicial notice, to the end that the public may the better understand what the province of the Court is and what it is not, and to show that the courts, in disposing of cases, can no more lean to the one side than to the other, from consideration of fear, or out of deference to public

opinion, or by way of conforming to personal views and opinions, concerning public policy and expediency, in disposing of any case.

A preliminary, but vital question in the case is whether the legislature has power to confer upon municipal corporations, sole and exclusive power to grant or refuse licenses for the sale at retail of spirituous liquors within their corporate limits. That it may do so, and, to that extent, deprive county courts of their jurisdiction in respect to such sales or traffic, has been expressly decided by this Court in *Ward & Co.* v. *County Court*, 51 W. Va. 102, and *Wilson* v. *Ross*, 40 W. Va. 278; and in *Moundsville* v. *Fountain*, 27 W. Va. 182, JUDGE GREEN, speaking for this Court, expressed the opinion that the legislature is not restrained, by the Constitution, from taking the jurisdiction out of the hands of a county court and vesting it in a municiual corporation. What was said in *Moundsville* v. *Fountain*, is probably an *obiter dictum*, but the other two cases have expressly and unequivocally enunciated the doctrine as a matter of positive and direct adjudication, that question being in each of the cases necessarily and inevitably involved. *Ward* v. *County Court* declares in point 2 of the syllabus: "The provision of chapter 44, Acts of 1899, that the council of the City of Grafton shall have exclusive power to grant liquor licenses within it, is not repugnant to section 34, Art. VIII. of the Constitution, or any other clause therein." *Wilson* v. *Ross* asserts the same proposition in the following terms: "The act of February 24, 1869, amending the charter of the town of Ceredo, confers upon the council of that town the sole power to grant or not grant a state license for the sale of intoxicating liquors within the limits of said town. Such act is not repugnant to the Constitution of the State (see section forty-six of article six, and section twenty four of article eight, of the State Constitution,) and such sole power to grant such license or not is recognized by section eleven of chapter thirty two of the Code as vested in the municipal authorities of such town."

While it is undoubtedly within the power of this Court to overrule its own erroneous decisions and declare them never to have been law except for the purpose of the par-

ticular cases in which they were rendered, and though it is sometimes done, such action is never taken until after the court has become fully convinced of their unsoundness. Nothing produced in the argument of this case impresses upon my mind any serious question as to the correctness of the views and conclusions expressed by the Court in the cases referred to. The argument against them is all predicated upon that portion of section 24 of Article VIII. of the Constitution which reads as follows: "The county courts, through their clerks, shall have the custody of all deeds and other papers presented for record in their counties, and the same shall be preserved therein, or otherwise disposed of, as now is, or may be prescribed by law. * * * * They shall also, under such regulations as may be prescribed by law, have the superintendence and administration of the internal police and fiscal affairs of their counties, including the establishment and regulation of roads, ways, bridges, public landings, ferries and mills, with authority to lay and disburse the county levies. Provided, That no license for the sale of intoxicating liquors in any incorporated city, town or village, shall be granted without the consent of the municipal authorities thereof, first had and obtained." If this provision stood alone, unlimited and unqualified by anything else in the Constitution relating to the sale of intoxicating liquors, the contention for exclusive jurisdiction in the county court, beyond the reach of legislative powers, would be plausible, but it does not stand alone and unqualified. Section 46 of Art. VI. relating to the powers of the legislature under the Constitution, says: "Laws may be passed regulating or prohibiting the sale of intoxicating liquors within the limits of this State." Section 24 of Art. VIII. does not expressly say the county courts shall have sole and exclusive power to grant or refuse licenses for such sales. In order to so hold and declare, the court would be bound to say that the matter of granting or refusing licenses belongs to the internal police and fiscal affairs of the counties, and, ordinarily, this might be true; but it was competent for the people, in adopting the Constitution, to say that, for certain purposes, among which is the matter of jurisdiction to regulate or prohibit, it shall not be deemed a part of the internal police and fiscal

affairs of a county, but a part of the police and fiscal powers of the State and left under the control of the legislature. Section 46 of Art. VI seems plainly to have been intended to effect this result, and, in the absence of any constitutional provision to the contrary, it would be so. At the time of the adoption of the Constitution, many, no doubt most, of the county courts of the State, possessed and were exercising, under the statute then in force, power to grant or refuse license. It was apparent, therefore, to the framers of the Constitution and the people that, until the legislature should see fit to exercise this power, under section 46 of Art. VI. the county courts would continue, under the then existing laws, to exercise jurisdiction, respecting the granting or refusing of licenses. There was a possibility that the legislature might never see fit to remove this jurisdiction from the county courts and vest it elsewhere. In view of these considerations, the framers of the Constitution and the people deemed it wise to impose a limitation upon the powers of both the legislature and the county courts, for the protection of municipal corporations, by ordaining the provision "That no license for the sale of intoxicating liquors in any incorporated city, town or village, shall be granted without the consent of the municipal authorities thereof, first had and obtained." A Constitution, for the most part, may be construed as a great compact or agreement, entered into by all the people of the State, for and on behalf of themselves and those who shall come after them, until such time as it is abolished, changed or modified. An elementary rule of construction, applicable to every kind of written instruments, is that all parts of the instrument under consideration shall be considered, and every portion, paragraph, clause and word given effect, if it be susceptible of such construction, and, whether it be so susceptible or not, all of its parts must be considered, and no court is warranted in expunging or declaring meaningless or ineffective any word, phrase or clause, except in the case of irreconcilable conflict and repugnance. It is equally as well settled by authority and consonant with reason and common sense, that no mere implication, not necessary, in the sense that it is so plain that the contrary thereof cannot be supposed, can ever be permitted to overcome, break

down, or cut out, as meaningless or irreconcilable, an express provision of a constitution or any other instrument. The language of section 46 of Art. VI. is plain, positive and unqualified. It says laws may be passed regulating or prohibiting the sale of intoxicating liquors within the limits of this State. There is no qualification or limitation as to the mode of regulation. That is left, by the language of this section, to the discretion of the legislature. No other express provision of the Constitution seems to qualify or restrain it in any manner or to any extent, except the proviso which has been quoted from section 24 of Art. VIII. Whether that is a limitation upon the power reserved by section 46 of Art. VI. we do not undertake to determine because it is unnecessary. No such question arises in the case. But if it is, it does not by any express terms say that jurisdiction for the granting or refusing of licenses is irrevocably vested in the county courts. It suffices the purposes of the proviso to say that, when the county courts, by virtue of laws passed by the legislature, have the power to grant licenses, they shall not license the sale of liquors in any incorporated city, town or village without the consent of the municipal authorities thereof, first had and obtained. This gives that proviso effect, a broad effect, operative on both county courts and the legislature, and that is all the rule of construction requires of the court. There is no authority or justification in any rule of interpretation for carrying it beyond this, so far as to cut down the word "regulating" in section 46 of Art. VI. That part of section 24 which says the county court, under such regulations as may be prescribed by law, shall have the superintendence and administration of the internal police and fiscal affairs of the counties, may also have effect, a broad, sweeping effect, without cutting down or impairing the language of section 46 of Art. VI. Until the legislature otherwise ordains, the matter of licenses may be, and probably is, in a legal sense, a part of the internal police and fiscal affairs of the counties. Said section 46 says, not that the legislature shall, but that it may, pass laws regulating or prohibiting the sale of intoxicating liquors within the limits of the State. This is broad enough to authorize the legislature to confer such power upon the county court. It would be one mode of regula-

ting the traffic, but not the only one conceivable. It was apparent to the framers of the Constitution that this might be the mode selected by the legislature, and, in that event, the county courts would have the superintendence and supervision of the traffic in liquors to the extent aforesaid. That, in a practical sense, the people could vest any particular power in the county court permanently or temporarily, absolutely or conditionally, is plain. That they had the power, in adopting the Constitution, to accomplish this is beyond question. The Constitution is the paramount law and the people of the State were the authors of it. Their power to do anything they saw fit, that did not infringe upon, or fall under the condemnation of, some provision of the Constitution of the United States, was absolutely without limit. In framing the Constitution and adopting it, they used language, which, according to its literal interpretation, reserves to the legislature unlimited power over the liquor traffic. Effectual regulation might require that the superintendence and administration of the liquor traffic be wholly withdrawn from the county courts and placed elsewhere. It was a matter which so impressed itself upon the authors of the Constitution that they felt called upon to deal with it, and provide for its regulation, by a special clause in the Constitution. If they deemed it a part of the police and fiscal affairs of the counties, they may have foreseen the necessity, at sometime, of power in the legislature to withdraw it from the county courts and commit it to some other tribunal or officer, and they used in the Constitution language of sufficient breadth, and apt phraseolgy, to accomplish this result, and language which cannot be made to have any other effect without qualifying or restraining it by a mere unnecessary implication, arising from language used in another part of the Constitution.

Courts are bound, in construing a constitution, statute or other instrument, to presume that the authors of the instrument had some purpose in inserting every clause found in it, and every word of the clause, and intended it to have some effect. If we say section 46 of Art. VI. only reserves to the legislature the power to prohibit the sale of intoxicating liquors and to prescribe regulations for the govern-

ment of county courts in granting or refusing licenses, we deny to so much of that clause as relates to regulation any purpose whatever. It was wholly unnecessary and vainly and futilely inserted in the Constitution, if it meant no more than this; for section 24 of Art. VIII. made the superintendence and administration of the county courts subject to "such regulations as may be prescribed by law." Unless we say, therefore, that the power to regulate reserved to the legislature by section 46 of Art. VI. meant something more than this, we must say that it means nothing, and that we are not at liberty to say, as will be shown by abundant authority, hereinafter cited.

The power to regulate the traffic in liquor is, I repeat, a part of the sovereign power of the State, in the absence of some constitutional provision, eliminating it therefrom and vesting it elsewhere. Such powers are not generally cut off, except by express provisions and never by any implication, unless it be a necessary one. There must be something in the constitution so plainly effecting this separation or delegation of power than the contrary cannot be reasonably supposed. Every presumption is against it. This Court, in *Dillon* v. *County Court of Braxton County*, 55 S. E. 382, declared, in reference, to the power of taxation, that "It is so high and extraordinary in character that it is presumed to remain in the legislature until the contrary is shown by express provision or the equivalent thereof. * * * Hence it cannot be maintained that the people, in adopting the Constitution, recognized a legislative power of this kind in these local tribunals, which they signified their intention to leave in their hands by not expressly divesting them. No clause in the Constitution, either in express terms or by necessary implication, denies to the law-making body the exencise of this species of legislative power, which must reside in it if it has not been taken away." This same rule must be applicable to a subject, deemed by the people to be so important as to require a special provision, respecting it, in the organic law of the State.

The rule of contemporaneous construction also sustains the decisions of this Court in *Wilson* v. *Ross* and *Ward* v. *County Court* and the *dictum* in *Moundsville* v. *Fountain*. At the date of the adoption of the Constitution in 1872, and long

before that time, certain municipal corporations of this state had the sole and exclusive power, under the statute, to grant or refuse license. This is asserted by JUDGE GREEN in *Moundsville* v. *Fountain*, and the act of the legislature passed November 28, 1863, recognizes that state of affairs. Section 3 of that act says: "Where the council of a city or town is, by its charter or any law of this state, authorized to grant or refuse licenses for any particular purpose, no license issued under this act shall be deemed to authorize any person to do any act, or carry on any business, calling or profession within the corporate limits of such city or town without having obtained license therefor as required by the by-laws or ordinances of such city or town, but all licenses granted under such by-laws or ordinances shall be assessed with and pay to the state the same taxes as other licenses of like kind, in addition to any tax payable thereon to such city or town." Section 4 of that act says: "Licenses to keep a hotel or tavern; or to sell drinks or refreshments at a public theatre; or to sell at retail spirituous liquors, wines, porter, ale, beer, or any drink of like nature; or to keep for public use or resort a bowling alley or saloon, billiard table or table of like kind, shall be issued only when authorized by resolution of the board of supervisors of the county, except where the council of a city or town are authorized, as aforesaid, to grant such licenses, in which case they shall be issued only when authorized by such council." Chapter 32 of the Code of 1868 recognizes the same condition of things. These laws, conferring upon certain municipal corporations sole and exclusive power to grant or refuse licenses, for the sale at retail of spirituous liquors were in force at the adoption of the Constitution. Nothing in the Constitution expressly repeals them. On the contrary, the Constitution itself provides as follows: "Such parts of the common law, and of the laws of this state as are in force when this article goes into operation, and are not repugnant thereto, shall be and continue the law of the state until altered or repealed by the legislature." Article VIII., section 21. These statutory provisions, recognizing such powers in municipal corporations, have remained in the Code and acts of the legislature, from 1863 down to the present time, and some of these powers were held long before 1863, as in the case of the city

of Wheeling. This fact signifies that the legislature had construed the Constitution, from the very date of the adoption of that instrument down to the present time, as authorizing it to confer upon municipal corporations the power in question, and the courts and people of the state have acquiesced in that construction for more than forty years and even longer. Now, the rule declared by an authority of no less renown than John Marshall, Chief Justice of the United States, in the great case of *McCulloch* v. *Maryland*, 4 Wheat. 316, 421, is that this acquiescence is so potent on the question of the construction of a constitution that courts will give heed to it and adopt it, unless it appears to be plainly wrong. After having said that the power to incorporate a national bank "being considered merely as a means, to be employed only for the purpose of carrying into execution the given powers, there could be no motive for particularly mentioning it," he continued as follows: "The propriety of this remark would seem to be generally acknowledged by the universal acquiescence in the construction which has been uniformly put on the 3d section of the 4th article of the Constitution. The power to 'make all needful rules and regulations respecting the territory or other property belonging to the United States,' is not more comprehensive, than the power 'to make all laws which shall be necessary and proper for carrying into execution' the powers of the government. Yet all admit the constitutionality of a territorial government, which is a corporate body." The same rule had been laid down, some sixteen years before, by Mr. Justice Patterson, of the same Court, in *Stuart* v. *Laird*, 1 Cranch 299, in the following terms: "Another reason for reversal is, that the judges of the Supreme Court have no right to sit as circuit judges, not being appointed as such, or, in other words, that they ought to have distinct commissions for that purpose. To this objection, which is of recent date, it is sufficient to observe, that practice and acquiescence under it for a period of several years, commencing with the organization of the judicial system, affords an irresistible answer, and has indeed fixed the construction. It is a contemporary interpretation of the most forcible nature. This practical exposition is too strong and obstinate to be shaken or controlled. Of course, the question is at rest, and ought not now to be disturbed."

In *Holmes* v. *Hunt*, 122 Mass. 505, (23 Am. Rep. 381,) the learned Chief Justice Gray said, concerning the constitutionality of the provisions of a certain statute, that it had been substantially re-enacted, upon each revision of the statutes of the commonwealth since 1817, a period of sixty years, and continued as follows: "They have been constantly applied in practice, and repeatedly expounded by this Court, without a doubt of their validity being suggested, for nearly sixty years. After so long a practical construction and acquiescence by the legislature, by the courts, and by all parties to judicial proceedings, it would require a very clear case to warrant the court in setting them aside as unconstitutional." See also *Packard* v. *Richardson*, 17 Mass. 122; *Commonwealth* v. *Parker*, 2 Pick. 550; Cooley's Cons. Lim. 69; *Fullington* v. *Williams*, 98 Ga. 807; *State* v. *Holcomb*, 46 Neb. 88; *Wallace* v. *Bradshaw*, 54 N. J. L. 175.

That certain municipal corporations in the state had sole and exclusive power to grant and refuse licenses at the date of the drafting of the Constitution, and its adoption by the people, together with the absence of any express provision in the Constitution which purports to take away such sole and exclusive power, and the presence of a clause in the Constitution continuing in force all laws, operative at the date of its adoption, argues conclusively that there was no intention, on the part of the people, to put into the hands of county courts jurisdiction to grant licenses within the municipal corporations which then had such sole and exclusive jurisdiction. Hence, it is thus made manifest that section 24 of Article VIII. of the Constitution was not intended to confer upon county courts sole and exclusive jurisdiction throughout all the counties of the state to grant or refuse licenses; and it never had, nor could have had, the application, force and effect, claimed for it by those who regard it as having lodged that jurisdiction irrevocably in the county courts. Thus, it appears that the framers of the Constitution themselves, construed their own product as this Court and the legislature have since construed it.

No doubt all this reasoning and authority would have been set forth by the able judges who prepared the opinions in *Wilson* v. *Ross* and *Ward & Co.* v. *County Court*, had they deemed it necessary. It is not to be assumed, by members

of the legal profession or the public in general, that courts, in delivering opinions, set forth in every instance all the reasons that can be assigned for their conclusions, and they are not required to do so. Unfortunately, however, it has happened, in respect to these decisions, that upon the assumption that all the reasoning was set forth in the opinions that could be given, the decisions themselves have been repeatedly called in question, and I have here discussed the matter at considerable length for the purpose of disabusing the public mind of the impression that the conclusion reached in them is unsound, or dubious in its foundation.

The remaining question is whether the legislature, having the power, as has been shown, to confer upon municipal corporations sole and exclusive authority to grant licenses for the sale at retail of spirituous liquors, has exercised that power in respect to the town of Point Pleasant. The claim that it has done so, is based upon two grounds, one of which is constituted by the provisions of chapter 40 of the acts of 1891. The other is an alleged amendment, made to the charter of the town of Point Pleasant, by the circuit court of Mason county, by an order entered in its chancery order book, on the 9th day of May, 1883, which amendment the court made, or attempted to make, under and by virtue of chapter 78 of the acts of 1877, providing for the amendment of the charters of municipal corporations, containing a population of less than two thousand, which act has since been incorporated into chapter 47 of the Code as section 47a. The material parts of the order read as follows: "It is adjudged, ordered and decreed that the charter of said town of Point Pleasant be amended as follows, towit: 'The council of said town of Point Pleasant shall have the sole power to grant all licenses within the corporate limits of said town.' Said amendment shall go into effect from and after this day." As the authority claimed by the town is based, by this Court, upon the act of 1891, what I intend to say, concerning the amendment, will be postponed, until after an examination and analysis of the provisions of the act of 1891.

The town of Point Pleasant was not incorporated by any circuit court under the provisions of chapter 47 of the Code, but by a special act of the General Assembly of Virginia, passed on the 19th day of December, 1794. This act of in-

corporation was amended and re-enacted by an act of the General Assembly of Virginia, passed on the 30th day of March, 1860. The sections of the act, necessary to be considered upon this inquiry, read as follows: "Sec. 35. The council shall prescribe, by ordinance, the manner in which licenses of all kinds shall be applied for and granted, and it shall require the payment of the taxes thereon before delivery to the person applying therefor." "Sec. 36. The provisions of the 29th section of chapter 32 of the Code of West Virginia, relating to state licenses, shall be deemed applicable to licenses of a similar character to those therein mentioned, when granted by or under authority of the council of said town. Licenses for the keeping of dogs shall also expire on the thirtieth day of April next after they are granted, and all other licenses may be for such time . as the council shall determine." "Sec. 40. All acts or parts of acts inconsistent with this act are hereby repealed; but this act shall not be construed to repeal, change, or modify any previous act not inconsistent with this act authorizing said town to contract debts, or to borrow money, or to take away any of the powers conferred upon said town, or upon the mayor or council or any of the officers thereof, conferred by general law, or by any amendment of its charter heretofore made by the circuit court of Mason county, except so far as the same may be inconsistent with the powers hereby conferred."

From the very language used by the legislature in the provisions of said act, chapter 40, considered and analyzed under, and in the light of, the rules of interpretation and construction, observed and enforced by the courts of the land, the intention of the legislature, concerning power in the council of the town of Point Pleasant to grant or refuse licenses, for state, as well as for municipal purposes, must be ascertained; and, when so ascertained, it must have force and effect, no matter what views the Court may entertain as to the wisdom, expediency or morality of the statute. We are not at liberty to resort to mere surmise or conjecture as to what the legislature intended. Except to a limited extent, and in a qualified sense, we cannot look outside of, or beyond, the language used in the act, and in so far as it is allowable, to look beyond the terms of the act, nothing can be considered or allowed to affect the question except those matters to which

the language of the statute refers in some manner.  While there are presumptions which the court must keep in mind and enforce, where there is necessity for it, and where the language of the statute is such as to make them applicable, and though things not expressly mentioned, but deemed to have been within the knowledge of the legislature, and to have been influential in the selection of the terms used by that body, may be regarded, nevertheless everything considered, upon the inquiry for the legislative intention, must have some substantial connection with the terms used. If it be something that is not expressly mentioned, it must be manifest that, by reason of its connection with the subject matter of the statute or its purpose and object, it entered into the deliberation of the legislature in the passage of the act.

In determining what the language of a contract, statute or other instrument means, it is absolutely necessary to bear in mind the subject matter of the instrument, and equally important to have regard to the purpose intended to be accomplished and effected, concerning the thing to which the instrument relates. To illustrate, if the paper be a contract, the first inquiry is whether it relates to land, horses, cattle or some other subject. If it appears to relate to land, the next inquiry is the identity of the land, or rather the ascertainment of what particular land it relates to. Then we look to see whether the language of the contract purports to be a lease or a conveyance of it, and, if it be a lease, we must find, from the terms of the contract, the purpose of the lease, the use to which the land is to be put. In most instances, the instrument is described as a deed, lease or contract, as the case may be, and that necessarily has weight in determining what it is, if the other terms are uncertain in their meaning. All this is nothing more than mere common sense, formulated into rules, and it applies to statutes just as much as to ordinary instruments, evidencing contracts between man and man.

The title of every statute sets forth its object and purpose and discloses its subject matter. The title of the act, now constituting the charter of the town of Point Pleasant, read in the light of the two previous acts which it amends and re-enacts, shows that the subject matter is the munic-

ipal corporation, known as the town of Point Pleasant. It also shows what purpose was intended with reference to that corporation. It says the purpose is not to deal with some particular powers of that corporation, by amending, repealing or altering the provisions of the previous acts, but to "designate the limits of said town   *   *   *   and to prescribe and define the powers and duties of the authorities thereof." It was not intended to deal specifically with that charter, but generally, comprehensively and completely, so that, instead of looking to chapter 44 of the acts of the General Assembly of Virginia, passed on the 19th day of December, 1794, and chapter 201, passed by said General Assembly on the 30th day of March, 1860, and chapter 47 of the Code of West Virginia, to ascertain the limits and powers and duties of the corporation, it should be necessary in the future to look only into chapter 40 of the Acts of 1891.

The rules of construction, applicable to a statute having such a purpose as this, differ from those applicable to a statute dealing specially, and in a limited sense, with its subject matter. It becomes a substitute for all other statutes previously enacted, relating to the same subject matter, in so far as the provisions of the previous statutes are inconsistent with its terms. By reason of its scope and purpose, it becomes, to the full extent of the express terms used, and necessarily implied, the exclusive rule and law upon that subject, and for that reason, any provision of any previous statute which conflicts with it, is repealed by implication, and this is mere matter of intention, arising by inference from the character of the act.

The rule that statutes relating to the same subject are to be construed together and harmonized, if possible, has no application in construing an act intended to be complete in itself. Lewis. Suth. Stat. Con. section 447. *Hamilton* v. *Rathbone*, 175 U. S. 414, in which Mr. Justice Brown said: "Where the meaning of the revised statutes is plain it (the court) cannot recur to the original statutes to see if errors were committed in revising them," and, again, "The whole doctrine applicable to the subject may be summed up in the single observation that prior acts may be resorted to to *solve*, but not to *create*, an ambiguity;"

and further, "The main object of the revision was to incorporate all the existing statutes in a single volume, that a person desiring to know the written law upon any subject might learn it by an examination of that volume, without the necessity of referring to prior statutes on the subject." The Am. & Eng. Ency. Law, Vol. 26, p. 731, says: "Where the later of two acts covers the whole subject matter of the earlier one, not purporting to amend it, and plainly shows that it was intended to be a substitute for the earlier act, such later act will operate as a repeal of the earlier one, though the two are not repugnant." For this, numerous cases are cited, among which is *Dist. of Columbia* v. *Hutton*, 143 U. S. 18, fully sustaining the text, as well as the proposition that the old and new statutes are not regarded as laws *in pari materia*. The court said: "The powers which are conferred are organic powers. We look to the act itself for their extent and limitations. It is not one act in a series of legislation, and to be made to fit into the provisions of the prior legislation."

"A subsequent statute revising the whole subject matter of a former one and evidently intended as a substitute for it, though it contains no express words to that effect, must on principles of law as well as in reason and common sense operate a repeal of the former law." *Herron* v. *Carson*, 26 W. Va. 62. This is reiterated in exactly the same terms in *State* v *Mines*, 38 W. Va. 125. In the opinion in the latter case, JUDGE BRANNON said: "Where the later statute makes full and complete provision touching the subject common to both, and it is evident that the legislature intended to review the legislation on that subject, and that the later act should be deemed a full and complete provision on the subject, the former statute is at an end." In *United States* v. *Claflin*, 97 U. S. 546, the rule was declared in the following terms: "Whenever a new statute covers the whole subject matter of an old one, and adds offences, varying the procedure, the latter operates by way of substitution and not cumulatively. The former is therefore impliedly repealed." That case related to the construction of a criminal statute, but the rule is applicable to all statutes. In *Eckloff* v. *District of Co-*

*lumbia*, 135 U. S. 240, and in *District of Columbia* v. *Hutton*, 143 U. S. 18, it was applied to an act of Congress, relating to the powers and duties of the commissioners of the District of Columbia, with reference to the appointment and maintenance of the police force. In the former case Mr. Justice Brewer said: "The court below placed its decision on what we conceive to be the true significance of the Act of 1878. As said by that court, it is to be regarded as an Organic Act, intended to dispose of the whole question of a government for this District. It is, as it were, a constitution of the District. It is declared by its title to be an act to provide "a permanent form of government for the District." The word "permanent," is suggestive. It implies that prior systems had been temporary and provisional. As permanent it is complete in itself. It is the system of government. The powers which are conferred are organic powers. We look to the act itself for their extent and limitations. It is not one Act in a series of legislation, and to be made to fit into the provisions of the prior legislation, but is a single complete Act, the outcome of previous experiments, and the final judgment of Congress as to the system of government which should obtain. It is the constitution of the District, and its grants of power are to be taken as new and independent grants, expressing in themselves both their extent and limitations. Such was the view taken by the court below; and such we believe is the true view to be taken of the statute." In the latter case, involving the same Act of Congress, this was reiterated and approved. The decisions of our own Court, in which the rule was enforced, involved statutes relating to civil, not criminal, matters. See in addition to the authorities cited for the rule, *Morris* v. *Crocker*, 13 How. (U. S.) 429; *Michell v. Brown*, 1 Ell. & Ell. 267; *Ex parte Baker*, 2 Hurl & N. 219; *Parry* v. *Croydon Gas Co.*, 15 C. B. (N. S.) 568. It is a rule by which to test a statute as to the legislative intention, and just as clearly applicable, when the question is whether new and additional matter has been incorporated, as when it is whether old matter has been eliminated. Under it, the elimination of old matter is effected by implication. The incorporation of new matter cuts out all in-

consistent old matter, without express declaration of intention to do so. Before the passage of chapter 40 of the acts of 1891, the charter of Point Pleasant, chapter 201, Acts of the General Assembly of 1860, limited the powers of the council, respecting licenses, to municipal licenses. Chapter 40 of the acts of 1891, omitted that section of the act of 1860, and substituted for it the language of sections 35 and 36 of the act of 1891. The new language, not the old, therefore, determines the legislative intention, respecting that matter. The old section is thus impliedly repealed under this rule, if inconsistent with the new, as well as expressly repealed by the first clause of section 40 of the act of 1891.

To what has been said, concerning the object and purpose of chapter 40 of the acts of 1891, as disclosed by its title, it is to be added that the same intention is further evidenced by the provisions of the act, covering almost every conceivable subject of municipal power. Section one constitutes certain inhabitants of the State a body politic and corporate under the name of the town of Point Pleasant; section 2 defines the territorial limits of the town; section 3 divides the territory into wards; section 4 gives power to change the boundaries of the wards and increase them in number, to not more than five; section 5 names the officers, prescribes their qualifications and provides for their election; section 6 provides for the holding of elections, prescribes the qualifications of voters and trial of election contests; section 7 fixes the terms of office; section 8 prescribes the oath of office; section 9 requires the council to prescribe the powers and define the duties of its appointed officers, except in so far as they are prescribed and defined in the act, and to fix the compensation of such officers; section 10 relates to the general powers of the council; section 11 gives authority to remove elected and appointed officers and fill vacancies; section 12 prescribes rules for meetings and procedure of the council; section 13 prescribes the duties of the clerk and how the records shall be kept: section 14 lays down a rule for keeping the minutes and taking the yeas and nays; section 15 prescribes the duties of the mayor and fixes his salary; section 16 relates to proceedings and enforcement of ordinances; section 17 pro-

vides for the enforcement of judgments; section 18 prescribes duties of the jailer; section 19 provides for the keeping of a docket by the mayor; section 20 provides for appeals in certain classes of cases from judgments in town cases; section 21 prescribes the mode of trial of such appeals; section 22 prescribes the judgment in certain classes of cases and provides for enforcement thereof; section 23 provides for appeals in other cases; section 24 relates to the duties of the marshall; section 25 provides for arrests and trial for violation of ordinances; section 26 prescribes how settlements shall be made by the marshall and fixes his compensation; section 27 gives remedies against the marshall; section 28 provides for deputy marshalls and makes the marshall chief of police; section 29 prescribes the duties of the assessor; section 30 relates to finances and expenditures; section 31 imposes a penalty for non-payment of taxes within the time specified; section 32 gives a lien on real estate for taxes; section 33 relates to the tax duplicate; section 34 prescribes the duties of the treasurer; section 35 relates to the granting of the licenses; section 36 relates to the duration of licenses; section 37 provides for condemnation proceedings for public purposes; section 38 relates to payments; section 39 relates to the status of the then officers and ordinances of the town; section 40 repeals all acts or parts of acts inconsistent with said act, but preserves to the town the benefit of all previous acts, provisions of general law and amendments previously made by the circuit court of Mason county, except so far as the same may be inconsistent with the powers conferred by said act; and section 41 requires the council to provide voting places in the several wards for holding an election on a certain day. A clause in section 10 relating to the general powers of the council provides that it shall have power to prevent " the desecration of the Sabbath day, profane swearing, the illegal sales of intoxicating liquors, drinks, mixtures and preparations." As this clause does not purport either to give or withhold power to grant or refuse licenses, but only to give power to prevent illegal sales of intoxicating liquors, drinks, mixtures and preparations, no consideration need be given it. It does not say how sales shall be legalized or who

shall legalize them, but only that the council may prevent illegal sales.

While chapter 40 of the acts of 1891 is thus manifestly a complete act, covering the whole subject matter of the corporate powers of the town of Point Pleasant, constitututing the organic law of the corporation, as said by the Supreme Court of the United States, in reference to the Act of Congress, relating to the District of Columbia, both impliedly and expressly repealing all previous inconsistent legislation, whether general or special, it was not ordained in the passage of this act that no previously existing powers, consistent with the powers conferred by it, should not be held or exercised by the town of Point Pleasant. It was the intention, disclosed by express declaration of the legislature, that powers conferred by such previous legislation, consistent with the powers conferred by chapter 40 of the acts of 1891, should thereafter be held and exercised by the town. In several instances, general statutes are expressly adopted by chapter 40. For instance, the mode of appealing from judgments of the mayor, except in cases specially provided for, shall be allowed as in similar cases before justices. Section 20 adopts the provisions of chapter 162 of the Code, relating to recognizance in criminal cases. Section 21 says the circuit court, on appeal from judgments of the mayor in the cases specially provided for, "shall proceed to try the same in its order, as appeals from justices of the peace are tried." Section 25 says the marshall and his sureties shall be liable to all the fines, penalties and forfeitures that a constable is liable to, for any dereliction of duty in office, to be recovered in the same manner, and in the same courts, that such fines, penalties and forfeitures are recovered against constables. Section 32 provides that, if any real estate within said town be returned delinquent for the non-payment of taxes due thereon, a copy of such delinquent list may be certified by the council to the auditor, and the same may be sold, for the town taxes and interest and commissions thereon, in the same manner, at the same time, and by the same officer, as real estate is sold for non-payment of state taxes. These instances will serve to illustrate what is meant by saying this complete and comprehensive charter of the town of Point

Pleasant has adopted and made parts of it many of the general laws of the State. In addition to adoptions by express reference and declaration, as in the instances just specified, there is a general adoption in the peculiar clause found in the repealing section, which declares "that this act shall not be construed  *  *  to take away any of the powers conferred upon said town, or upon the mayor or council or any of the officers thereof, conferred by general law, or by any amendment of its charter heretofore made by the circuit court of Mason county, except so far as the same may be inconsistent with the powers hereby conferred." Viewed in the light of the subject matter and purpose of the act, as disclosed by its title and its provisions, the reasonable and fair construction of this clause is, not that it is a proviso, saving clause or exception, but an adoption of all such special and general provisions of preexisting law, conferring powers upon said corporation as are not inconsistent with the provisions of the act. It is not in the form of a proviso. It is introduced by the conjunction "but" and not the word "provided." Its language is not limited, and does not relate, to the saving or validation of acts done under previous laws, but to the powers which the corporation should have authority to exercise in the future. Even if it had been preceded by the word "provided" or its equivalent, its office and purpose would be determined, not by its form, but by the intention of the legislature as gathered from the whole instrument. In *Stanley* v. *Colt*, 72 U. S. 119, (18 Law Ed. 502,) Mr. Justice Nelson said: "It is true that the word 'proviso' is an appropriate one to constitute a common law addition in a deed or will, but this is not the fixed and invariable meaning attached to it by the law in these instruments. On the contrary, it gives way to the intent of the parties as gathered from an examination of the whole instrument, and has frequently been thus explained and applied as expressing simply a covenant or limitation in trust." And the Court declared the doctrine in the syllabus of the case in these terms: "The word 'proviso' has frequently been applied as expressing simply a covenant or limitation in trust." In *Georgia Railroad Co. & Banking Co.* v. *Smith*, 128 U. S. 174, (32 Law Ed. 377), the same Court

22

declared as follows: "The general purpose of a proviso
is to except the clause covered by it from provisions of
the statute or to qualify a portion of the statute.   But it
is often used as a conjunction to an independent para-
graph." In *Chesapeake & Potomac Telephone Co.* v. *Man-
ning*, 186 U. S. 238, (48 Law Ed. 1144), the same doc-
trine was declared and applied.   The distinction and prin-
ciple are not unknown to this Court.   In *Ches. & O. Ry.
Co.* v. *Pack*, 6 W. Va.  397, 403,  JUDGE HOFFMAN said:
"The proviso might, without very serious change of gram-
matical arrangement, be regarded, not as a part of the
section re-enacted, but as an independent section following
it." In view of the clear purpose of the legislature, as
shown by the title and provisions of the statute under con-
sideration,  I have no hesitancy in saying that the object
and intent of the clause found in section 40 was, not to
continue in force previously existing laws, conferring, or
purporting to confer, powers upon the council of the
town, not inconsistent with the provisions of the act, but
to make them operative and effective as new laws, by
virtue of that act, and not by virtue of the statutes in
which they originally appeared.   I do not regard this con-
clusion as conflicting with the following rule laid down in
*State* v. *Mines*, 38 W. Va. 125: "When a statute is
amended and re-enacted with the words, 'so as to read
as follows,' or words of like effect, those parts of the re-
enactment embraced in the former law are not considered
as repealed and re-enacted, but as law all along con-
tinuously from their original enactment."   In respect to
the clause now under consideration, that rule does not apply.
It does not repeat the words of the general and special laws
adopted, and it is not an act merely amending a part of the
statute or statutes.   Let it be observed, too, that the
rule quoted does not say, as matter of fact and strict law,
that the old law is not declared or affirmed anew, born
again, but only that it is "considered" as having been in
force uninterruptedly, so as to make it work out certain
results as to past transactions.   Here, we look at it from
a different point of view, its future effect, in respect to
which there is no necessity for the interposition, of a
fiction, and fictions can only be resorted to when neces-

sary to work out justice and equity, never to defeat it. This statute is broader in its scope, than the one on which the rule is predicated, covering a whole subject. If we say the language of the clause, "This act shall not be construed * * to take away any of the powers conferred upon said town, or upon the mayor or council or any of the officers thereof, conferred by general law, or by any amendment of its charter heretofore made by the circuit court of Mason county, except so far as the same may be inconsistent with the powers hereby conferred," means no more than that these powers shall be saved and continued in force by exception, we render it wholly useless and meaningless, for section 40 would then stand precisely as if the legislature had stopped after saying "All acts or parts of acts inconsistent with this act are hereby repealed." Under no rule, known to the courts, does a statute, to which there is appended such a repealing clause, do away with any pre-existing statute or law not inconsistent with it. Without a word added, the town would still have had the benefit of all powers conferred by any previous law, whether to borrow money, contract debts, or do anything else, not inconsistent with the powers specifically conferred by the act. We are bound, therefore, to say that the legislature intended something more than a mere continuation of statutes and amendments on their old footings. What could it have intended different from that, other than a re-declaration, re-affirmance and adoption of previous laws, as new provisions or parts of the new act? Nothing else has been suggested or can be conceived, and we are bound to say that the legislature intended this clause to have some effect. "In the construction of a statute, every part of it must be viewed in connection with the whole, so as to make its parts harmonious, if practicable, and give a sensible and intelligent effect to each. It is not to be presumed that the legislature intended any part of the statute to be without meaning." *Bank* v. *County Court*, 36 W. Va. 341. Lewis' Suth. Stat. Cons., section 491, p. 919. "It is presumed, as well on the ground of good faith as on the ground that the legislature would not do a vain thing, that it intends its acts and every part of them to be valid and capable of being carried into effect." *Id.* section 497, p. 926. "The intention

of the law-makers, if plainly expressed, must have the force of law, though it may be in the form of a proviso; the intention expressed is paramount to the form." *Id.* section 382, p. 674.

Besides general laws, expressly adopted, others may be found to have been adopted by necessary implication. For illustration, section 32, relating to sale of real estate for non-payment of municipal taxes, may be taken. It does not require, in express terms, the recordation of the delinquent list in the office of the clerk of the county court. That it shall be so recorded has been judicially declared by this Court, on the theory that the duty to do so is necessarily implied in the requirement that the land shall be sold in the same manner, at the same time, and by the same officer, that real estate is sold for the non-payment of state taxes. *Hogan* v. *Piggott*, 60 W. Va. 541, (56 S. E. 189.)

If the legislature in passing chapter 40 of the acts of 1891, had said nothing concerning the powers of the council of the town of Point Pleasant, respecting the granting or refusal of licenses, it would probably be clear that, by necessary implication, or by the terms of chapter 47 of the Code, the extent of its powers relating to that subject, and the mode of exercising them, would be prescribed and governed by that chapter. But it was not silent. It acted. What it intended, therefore, must be ascertained from the terms it used, respecting the powers of the council as to such licenses. One question is, whether or not it legislated on that subject, and that depends upon the meaning of the terms it used. If it did legislate on that subject, its intention must likewise be determined from the language it has used in the sections relating thereto. From the very nature and object of the act, assuming to prescribe and define the powers and duties of the authorities of the town, all of its powers and duties, so that it should be necessary only to look into the provisions of that act, including provisions expressly and impliedly adopted from other statutes, for such powers and duties, the absence of any express provision at all on so important a subject as this would be strange and unexpected. It would be contradictory of express terms and the general

purport of the statute. It would be in the nature of a legislative freak, if we are at liberty to assume that there could be such a thing. In view of the presumption so raised that the legislature did intend to define the powers of the corporation, respecting this matter, as well as every other one that could arise, it must be assumed that the language of sections 35 and 36 of the act was intended to express the legislative will on that subject and to constitute, together with such general provisions of law as are made applicable to the subject, by necessary implication, all the provisions of the charter of the town, relating to it. Why should the legislature, in direct contradiction of its expressed purpose, and its manifest effort, to define the powers of said corporation, all of them, fail to act on this one? Is the Court at liberty to assume such stupidity on the part of the law-making body of the state? The legislature spoke on the subject, and we are bound to say, not only that it intended something by the language it used, but also that it intended its language to be the sole and exclusive rule and declaration of its intention, as to the powers of the council, respecting licenses.

That the power to grant or refuse licenses was a subject of deliberation by the legislature, at the time of the passage of the act in question, is disclosed not only by the terms of the act but also by the journals of both branches of the legislature. As originally introduced, the bill contained 43 sections, of which sections 35, 36, 37 and 38 related to the matter of licenses. Sections 35 and 36 read as follows: "The council shall also have power to grant, refuse or revoke licenses, to owners or keepers of hacks, carts or wagons, drays, and of every other description of wheeled carriage kept or used for hire in said town; to levy and collect a tax thereon, and to subject the same to such regulation as the interest or convenience of the inhabitants of said town in the opinion of the council, shall require; to grant, refuse and revoke licenses to theatrical exhibitions, public shows, musical performances, and all performances by which admission is obtained by the payment of monay or other rewards; and for keeping dogs within the town, and for anything else for which a state license is now or may hereafter be required; and to levy and collect taxes on the same; and to

grant, revoke and refuse any license to sell or offer for sale, and to prohibit the sale or offering for sale, of any brandy, whiskey, rum, gin, wine, porter, ale, or beer, or any other spirituous, vinous or malt liquors, or any intoxicating liquor, drink or mixture or preparation whatever, within said town or within one mile of the corporate limits thereof, and shall require a tax thereon of not less than one hundred dollars nor more than two hundred dollars, and to enforce the authority hereby granted by reasonable fines and penalties.''

''36. When any such license is granted by the council to sell or offer for sale, brandy, whiskey, rum, gin, wine, porter, ale or beer, or any other spirituous, vinous, or malt liquors, or any intoxicating liquor, drink or mixture, it shall take from the person so licensed a bond, with approved security, in a penalty of not less than three thousand dollars, payable to the State of West Virginia, and conditioned as prescribed in section twenty-two, of chapter thirty-two, of the Code of West Virginia. The council may provide for the punishment of such person for the violation of any of the conditions of said bond, and suits may be brought and maintained against such person and his sureties on such bond, for the same objects, by the same person, in the same manner and with like effect, as upon a bond taken under the section mentioned; and also, for any fines and costs that may be imposed by the mayor for any offense against the town, under its ordinance, involving a breach of the condition of such bond, and the council may revoke any such license for a breach of any of the conditions of such bond, or for other good cause shown, but the person holding the license must first have reasonable notice of the time and place of hearing and adjudicating in the matter, as well as the cause alleged, and he shall be entitled to be heard, in person or by counsel, in opposition to said revocation.'' The bill passed the Senate, after amendment by inserting, before the words ''and to grant, revoke and refuse any license to sell'' the words ''shall have the sole power.'' It was so passed by a vote of nineteen yeas and no nays. After it went to the house, it was referred to the Judiciary Committee, which reported it back with the following recommendation:

"Strike out all section 35 from and after the word 'same,' in line eighteen of engrossed bill, and insert the following:

'But no license to sell, offer or expose for sale any brandy, whiskey, rum, gin, porter, ale or beer, or any other spirituous, vinous or malt liquor, or any intoxicating liquor, drink, mixture or preparation thereof, within said town or within one mile of the corporate limits thereof, shall be authorized or granted except as provided in chapter 32 of the Code of West Virginia; and where any such license is granted as aforesaid, with the assent of the corporate authorities of said town, the same may be revoked by said town authorities, for good cause shown after reasonable notice or the intention to do so to the person holding said license. And the corporate authorities of said town may subscribe by ordinance the amount of town taxes to be paid upon every such license, but not less in any case than one hundred dollars. The corporate authorities shall also have power to require and take from every person to whom any such license is granted, a bond with good security, in the penalty of not less than one thousand dollars, conditioned as prescribed in section 18 of chapter 32 of the Code, and the town shall have the same remedy on said bond as is prescribed in said section.'

Strike out all of section 36.

And recommended that the bill pass as amended." When the bill was taken up on second reading, with the amendments proposed by the committee, the amendments proposed were, by unanimous consent, withdrawn. Then sections 35 and 36 of the bill were wholly stricken out, leaving 41 sections instead of 43, and making sections 37 and 38 of the original bill 35 and 36 of it as so amended. It was then passed to its third reading and afterwards passed in that form, and the amendment was agreed to by the senate.

As so passed, it contains sections 35, 36 and 40 as they now appear in chapter 40 of the acts of 1891. These sections have been quoted. Sections 35 and 36 relate specifically to the matter of licenses. They do not adopt in express terms, by reference or otherwise, any general law on the subject, applicable to county courts or municipal corporations. They do not say or imply, by any terms used, that the licenses thereby referred to are municipal licenses.

They do not say or imply that the provisions of chapter 47 of the Code, relating to municipal licenses only, shall govern the council in respect to the matter of licenses. Bearing in mind the fact that the legislature was, according to its own definition of its action, making a complete law for the government of the town of Point Pleasant and fully defining its powers, and that its method of adopting the provisions of other statutes was, for the most part, the use of express terms of reference for that purpose, we should be able to find something in these two sections, dealing with the question of license, showing an intention to adopt the provisions of section 33 of chapter 47 of the Code, before we can qualify, limit or cut down the import and meaning of the terms used in these two sections which include licenses of all kinds. There is an adoption, by reference, in section 36, of certain provisions of the general state law relating to state licenses, but none to the statute relating to mere municipal licenses. All this strongly argues the intention of the legislature, that the expression of its will, on the subject under consideration, should have effect according to the literal import of the terms used, and that only such provisions of any general statute relating to the matter of licenses, not expressly adopted as a part of the two sections, as should be necessary to the effectuation of the powers conferred, as indicated by the language used, should become, or be deemed, a part of those two sections.

Section 35 says that the council shall prescribe, by ordinance, the manner in which licenses of all kinds shall be applied for and granted. It does not say in express terms that the council shall have power to prescribe as aforesaid; but how could it prescribe without having the power to do so? The power to do what the legislature says the council may do or shall do is necessarily implied. It does not say either, in express terms, that the council may grant licenses of all kinds, or may grant licenses of any kind. But what would be the use or sense of requiring or authorizing a council to prescribe the manner of doing a thing which it has not the power to do? Is it to be assumed that the legislature intended that the council should prescribe the manner in which the county court or some other tribunal

should grant a license? That would be going out side of
the object and purpose of the statute, which was not to
prescribe and define the powers and duties of any county
court, but to prescribe and define the powers and duties of
the council. For whom, other than itself, could it pre-
scribe the manner of doing a thing? Common sense, as
well as the rule of law, says plainly, nobody. What would
be the sense of requiring or authorizing it to prescribe the
manner of applying for and granting licenses which it has not
the power to grant? Can it be assumed that the legislature
did the vain and idle thing of requiring the council to pre-
scribe the manner of granting licenses without giving it
power to do so? The decisions of this Court and all
other courts forbid such an imputation upon the legislature.
It would be equivalent to saying that body was engaged in
mere child's play, or was so reckless and incompetent that
the language used by it, in the great and solemn work of
ordaining laws, does not express its intention, or does not
mean anything, and that we must seek its intention in con-
jecture or surmise, or something other than the words it has
used. That no such course can be taken by the Court
consistently with law, must be admitted by all. Au-
thorities already cited in this opinion put it beyond con-
troversy.

"When the intention is clear, what is implied in a statute
is as much a part of it as what is expressed." 26 Am. &
Eng. Ency Law 624. "When the legislature has power to
enact a law and its intention is manifest, effect will be
given to the intention rather than to a mere failure of its
language to express or prescribe what was intended." Lewis'
Suth. Stat. Con., section 233, p. 438. "There could be no
paying without previous receiving. The latter duty is ex-
plicitly declared. The prior one is as clearly to be inferred.
Both would be alike implied in the absence of the provision
as to paying over. What is implied in a statute, will, deed
or contract is as much a part of it as what is expressed."
Mr. Justice Swayne in *United States* v. *Babbitt*, 95 U. S.
334; *United States* v. *Babbitt*, 66 U. S. 55, citing *Koning*
v. *Bayard*, 2 Paine 251; *Haight* v. *Holley*, 3 Wend. 258;
*Rodgers* v. *Kneeland*, 10 Wend. 218; *Fox* v. *Phelps*, 20
Wend. 447. "A thing within the intention of the makers

of the statute is as much within the statute as if it were within the letter.'' *Stowel* v. *Zouch*, 1 Plowd. 366; *United States* v. *Freeman*, 3 How. (U. S.) 565; *United States* v. *Babbitt*, 66 U. S. 55. Did the legislature intend what it said, if it said anything, and that it did say something nobody can deny; and, if it said anything, it said the council should have power to grant all licenses, or it intended by what it said to incorporate or adopt section 33 of chapter 47, or the old provision of chapter 201 of the acts of 1860. Now what word is to be found in the language used which purports to make any such adoption? There is absolutely none, and no such adoption can be made without cutting down the language used so as to make it mean less than the words, taken in their natural and ordinary significa- tion, mean.

The only contention is that the broad terms ''licenses of all kinds'' may be restrained and limited by construction so as to apply to municipal licences only, and not to include state licenses. It is said we must read section 35 in connec- tion with the provisions of chapter 47 of the Code. I have shown, I think, conclusively, that in construing this statute, we cannot go to chapter 47 for the law upon any subject which has been legislated upon in chapter 40 of the Acts of 1891, except in so far as the provisions of that chapter of the Code have been, expressly or by necessary implication, adopted by chapter 40 of the acts of 1891; for the reason that said chapter 40 is a complete, comprehen- sive and exclusive embodiment of the law defining all the powers of the authorities of the town of Point Pleasant. But if this were not so, the contention for the qualification or limitation of the meaning of the term ''licenses of all kinds'' cannot be sustained under the authorities. Under chapter 47 town councils have power to grant municipal licenses only for all things for which state licenses may be granted by county courts. To adopt the construction con- tended for, therefore, we would have to say the terms ''licenses of all kinds'' mean municipal licenses for all things for which a municipal license may be granted. That is contrary to the terms used in section 35 of this act. It means less than the terms used in this act import, for, in one sense, there are two kinds of licenses, state licenses and

municipal licenses, and this construction would cut down language, broad enough in its terms to include both classes, so as to make it apply to only one of them. "All kinds" means all classes as well as all the individuals of each class. No more comprehensive terms could have been used. The construction asked for would reduce their meaning to the narrowest possible limit. That this would do violence to the rules of · construction is plainly manifest. "A statute ought to be construed as a whole, and each section should be so construed, that, if possible, no clause, sentence or word should be superfluous, void or insignificant." *Jackson* v. *Kettle,* 34 W. Va. 207; *Baxter* v. *Wade,* 39 W. Va. 281; *Argand* v. *Quinn,* 39 W. Va. 535. Reference has already been made to *Bank* v. *County Court,* 36 W. Va. 341, and other authorities, saying it is not to be presumed that the legislature intended any part of a statute to be without meaning. Moreover, to adopt the construction, contended for here, would make section 35 of the charter act meaningless and ineffective for any purpose. If it was the intention that the powers of the council should be governed by the provisions of section 33 of chapter 47 of the Code, respecting licenses and ordinances, the requirement of ordinances relating to the manner of applying for and granting the same, by the act of 1891, was useless and subservient of of no purpose whatever. Section 33 of chapter 47 gives the power to grant municipal licenses to all corporations, governed by that chapter, and section 29 of said chapter authorizes the passage of ordinances for carrying into effect the power to grant licenses, together with all the other powers conferred upon such corporations. It says "to carry into effect these enumerated powers, and all others conferred upon such city, town or village, or its council, by this chapter or by any future act of the legislature of this state, the council shall have power to make and pass all needful orders, by-laws, ordinances, resolutions, rules and regulations, not contrary to the constitution and laws of this state." If it was the intention of the legislature, that the council of the town of Point Pleasant should be governed by these pro-provisions, what possible necessity or reason could there have been for authorizing, or requiring, it to pass ordinances prescribing the manner of applying for and granting

licenses? It only amounted to a repetition of what was, by chapter 47, if intended to be made a part of chapter 40 of the acts of 1891, already required and authorized. Thus, the Court, in its attempt to qualify or cut down the literal import of the words found in section 35, would find itself overthrowing another rule of construction to which reference has been made, and which says, in substance and effect, that we must presume the legislature had a purpose and object in the selection of the terms it has used in the statute, and intended those terms to have some effect,—to accomplish some purpose. It would make them perform no office whatever.

It is further contended that the action of the legislature, respecting the provisions of the original bill, the amendment, made by the senate and the striking out of sections 35 and 36 thereof, discloses intention to withhold from the council the sole power to grant licenses, and not to make it a license court for purposes other than the granting or refusing of municipal licenses. These legislative transactions do not reflect any light upon the subject. They do not import any intention to change the general character of the statute and make it a special and incomplete law to operate in connection with other existing laws. After all this had been done, the bill continued to be one, the apparent and declared purpose of which was the ordaining of a law, complete and comprehensive, covering the whole subject matter, and intended to be a substitute for all other laws inconsistent with it. The bill, if passed by the house, in the form in which that body received it, would have given in express terms, sole power to the council to grant licenses of all kinds. The judiciary committee of the house proposed to amend it so as to take away that power. That amendment was withdrawn, and part of the language of the bill, importing an intention to vest such sole power in the council, was stricken out. But only a part of it was stricken out, and the balance of it allowed to stand. Had it all been stricken out, the action might have afforded ground for the presumption that it was intended that the town should have power to grant licenses under the general law, chapter 47 of the Code. But, inasmuch as it was not all stricken out, we must determine what the remaining portion of it

means, and that can only be done by the application of well settled rules of construction. The remaining language is not ambiguous. It is merely general. It gives power by implication rather than express words, but the implication is an absolutely necessary one, for, without it, the terms used would be meaningless and ineffective, as has been shown. While the house struck out two sections, leaving comprehensive terms relating to the subject matter thereof, it did not so change the title of the bill as to make its object the amendment of certain sections of the old charter act and make it a partial, incomplete law. It did not, by reference or otherwise, incorporate anything as a substitute for the matter stricken out. What reasons impelled the several members to vote for the bill in that form, or what actuated them in changing its form, the Court cannot inquire. What they or any of them said on the occasion is not admissible. 26 Am. & Eng. Ency. Law 638; *U. S.* v. *Trans-Miss. Assn.* 166 U. S. 318; *Am. Net. & T. Co.* v. *Worthington*, 141 U. S. 473. Nor can we assume, or allow it to be proved, that anything was put into, or taken out of the bill, by fraud, trickery or imposition. *Slack* v. *Jacob*, 8 W. Va. 612. We must take the language as it is and determine what it means.

That the striking out of sections 35 and 36 of the original bill, containing the senate amendment, is insufficient, in view of the character and purpose of the bill, and what was left in it, relating to the granting of license, to show that the legislature did not intend what the remaining words import, seems manifest from the disposition made of a similar question by this Court in *Coal & Coke Co.* v. *Tax Commiseioner*, 59 W. Va. 605, 630, 631, In that case, the words "including chattels real," found in the bill as it passed the house, were stricken out of one clause by the senate. This was relied upon, by counsel for the Coal Company, as conclusive evidence that it was not intended to put chattels real on the tax list at all, and certainly not those owned by corporations. In reply to that contention, this Court said, through Judge Brannon, "Why, then, did not the legislature strike out ' chattels real' from section 61? Why did it not strike from section 80 clause (a) the words 'including chattels real,' thus charging individuals and firms

not incorporated with them? Why did it still later in the consideration of the bill insert, in section 108 charging taxes, a clause reading: '(pp) The value of all chattels real of every person, firm or incorporated company?' This last most explicit language flatly says that corporations shall be taxed for chattels real." It was held that chattels real, belonging to corporations, were taxable under the statute, notwithstanding a clause of a section said in explicit terms, after referring to clauses naming every other species of property, and omitting chattels real, that the property mentioned in them should constitute all the property on which any such corporation should be liable to pay taxes. The Court very properly, in that case, as in all others, gave force and effect to the plain, explicit and positive terms of the statute as it was finally passed, notwithstanding the circumstance that some similar language had been stricken out of the bill in its progress through the legislature. If the language had been ambiguous, susceptible of two or more different meanings, or applications, without doing violence to its terms, the circumstance of the elimination of certain language, while the bill was pending, might be sufficient to determine which meaning or application was intended. That was not the condition of the language of the tax statute in the case just referred to, nor of the language in section 35 of chapter 40 of the acts of 1891, which we have under consideration. It is plain and explicit and positive. The only criticism that can be made upon it is that it expresses the legislative intention in an awkward and unusual form, a matter of no consequence whatever, so long as the intention plainly appears, as it does. "The intention expressed is paramount to form" and "must have the force of law," Lewis' Suth. Stat. Cons., section 452; *Ches. & Pot. Tel. Co.* v. *Manning*, 186 U. S. 239.

If the language used were ambiguous, so as to give room for construction or interpretation, by reference to extrinsic circumstances or facts, the same conclusion would result from a view and analysis of the language used in section 35, read in the light of the clause in section 40, relating to the amendments to the charter of the town by the circuit court of Mason county. Among these amendments, was the one

made on the 9th day of May, 1883, which has been quoted and purported to confer upon the council sole power to grant all licenses within the corporate limits of the town. The language of that clause is broad enough to include all amendments so made. It is presumed that the legislature has knowledge of the subject matter of its action. The spectacle of a legislature, passing laws concerning a subject or thing, about the facts of which it did not have knowledge, would be strange, if not absurd. It would be repugnant to common reason, just as much so as in the case of two men, making a contract, unless the contrary affirmatively appears. Therefore, the courts say that the words of a statute are to be interpreted in the light of the subject matter. · *Brewer* v. *Blougher*, 14 Pet. (U. S.) 178, 196; *United States* v. *Caldwell*, 86 U. S. 114; Am. & Eng. Ency. Law 604. The charter of the town of Point Pleasant, at the time the legislature acted upon it, in passing chapter 40 of the acts of 1891, appeared to have been amended by the circuit court of Mason county, so as to confer this power. The act thus shows that the legislature knew the amendment had been made. It was not its province to determine whether any of those amendments were valid or not. That is not the business of legislatures. They have no power to determine such questions. They are judicial questions and cognizable only in a judicial forum. The legislature, therefore, did not, because it could not, assume or declare expressly, or otherwise, that the amendment in question was not a valid one; in other words, that this amendment is not included in the clause of section 40, because, in the opinion of the legislature, it was not an amendment. Courts cannot assume that a legislature has meddled with something that, in common parlance "is none of its business." That must be shown, before it can be considered. "The legislature cannot authoritatively declare what the law is or has been; that is a judicial function and pertains to the court." Lewis' Suth. Stat. Cons., section 358, p. 683; *Ogden* v. *Blackledge*, 5 Cranch, 272, (2 Law Ed. 276; *South Ottowa* v. *Perkins*, 97 U. S. 260, (24 Law Ed. 154); *In Re Hanley's Estate*, 150 Utah 212, (62 Am. St. Rep. 629, 931); *Ratcliffe* v. *Anderson*, 31 Grat. 105. "It is always competent to change an existing law by a declaratory statute, and,

where the statute is only to operate upon future cases, it is no objection to its validity that it assumes the law to have been in the past what it is now declared that it shall be in the future. But the legislative action cannot be made to retroact upon past controversies, and to reverse decisions which the courts, in the exercise of their undoubted authority, have made; for this would not only be the exercise of judicial power, but it would be its exercise in the most objectionable and offensive form, since the legislature would, in effect, sit as a court of review, to which parties might appeal when dissatisfied with the rulings of the courts." Cooley's Con. Lim. 11. It is not to be assumed, therefore, that the legislature, having no power to determine, whether the amendment made by the circuit court was valid or invalid, assumed that it was invalid, and, therefore, did not include it in its reference generally to the amendments made by the circuit court. The declaration that nothing in the act shall be construed to take away power conferred by any amendment, made by the circuit court, not inconsistent with this act, is the same in meaning as if it had been that the council shall have the powers conferred by all the amendments, not inconsistent with this act, made by the circuit court. It reaches all the amendments, not merely one of them. Though negative in form, it is affirmative in meaning and effect. Can the words "any amendment" be limited to one amendment; if so, which one? The impossibility of applying them to any one in particular proves that they extend to all. That body knew, is presumed to have known, that there was attached to the charter of the town a paper purporting to be an amendment, conferring just such power as the language contained in section 35 of the act necessarily implies. The existence of that ostensible, if not valid, amendment was a circumstance known to the legislature, when it used language in section 35 which purports, by necessary implication, to confer the very power which the amendment purported to give. This shows, by legislative terms, the opinion of the legislature that the town already had that power. Courts may take cognizance of facts known to the legislature, which tend to throw light upon the question of intent. This is settled beyond all question. *Platt* v. *Union Pacific Ry. Co.*, 99 U. S. 48;

*Church* v. *United States*, 143 U. S. 457; *Railway Co.* v. *United States*, 91 U. S. 72; *The Delaware*, 161 U. S. 472; *Amer. Net. & T. Co.* v. *Worthington*, 141 U. S. 468. They may consider all the surrounding circumstances and history of the times. See in addition to cases just cited, *Simms* v. *Daniel*, 49 W. Va. 354; *C. & O. Ry. Co.* v. *Deepwater Ry. Co.*, 57 W. Va. 641. Here we need not look beyond the language of the statute itself, to ascertain that the legislature knew amendments had been made by the circuit court to the charter of the town of Point Pleasant. It declared its knowledge of them in the act. One of them is disclosed by the record. It is not only a circumstance known to the legislature, but a part of the subject matter of the statute. This evidence of belief, on the part of the legislature, that the town had, by virtue of the amendment, sole power to grant licenses, accompanied by the declaration of a rule of action for the council, predicated on the assumption of such power and referable to no other conceivable hypothesis, makes the legislative intention to grant such power so plain that nothing can be urged against it, but mere conjecture and surmise.

Two of my associates fully concur with me in the view that section 35 of chapter 40 of the acts of 1891, read in the light of section 40, confers, upon the town council, the power in question, and we reverse the judgment of the circuit court, predicated upon the theory of a want of such power in the council. I am prepared to go further and say that, if section 35 were not in the statute, the power claimed by the town of Point Pleasant, would be sustained by section 40 alone, of chapter 40 of the acts of 1891. It is plain, as has been pointed out, that the clause in that section relating to the amendments made by the circuit court of Mason county, is not a saving clause nor an exception. It is an independent provision intended to add to the preceding sections of the act. I have shown that, unless it is so regarded, it is a futile and vain expression, effecting no purpose and performing no function whatever, and we are not permitted, by the rules of law, to place such a construction upon it. The legislature treated and regarded the amendments made by the circuit court, not some of them, but all of them, for it refers to all of them, as valid and conferring powers. The language used in the clause assumes that these

amendments conferred powers, for it says nothing in the act shall be deemed to take away the powers conferred by them. How could there be anything to take away, in respect to this amendment, if it conferred no power, or was not regarded as conferring power? In saying power conferred by the amendment should not be taken away, the legislature, by necessary implication, said the amendment had conferred power. The language used by the legislature, I repeat, assumes that the amendment conferred power, whether it did or not, and deals with it as an amendment cenferring power. It calls it an amendment. If it conferred any power, it could have been none other than the very power in question. In assuming that it did confer such power and declaring that nothing in this act should be construed to take it away, the legislature clearly and positively expressed its will that the town council should have such power in the future, whether it had had it in the past or not. It is a question of intention, and when the contention is apparent, it must be given effect without any regard to the form in which it is expressed. If the amendment was invalid, and not law, and not embodied in any act of the legislature or Code, that circumstance is immaterial. The legislature had the power to incorporate it into the act and, upon its identification, wherever found, it became part of the act. In *Delaplane* v. *Crenshaw*, 15 Grat. 457, one question was whether a certain alleged custom or usage, relating to the inspection of flour, had been incorporated into the statute, concerning the same subject. The law provided for an inspection of flour, which inspection consisted partly in boring small holes in the heads of the barrels and making a draft of flour from each hole, to be inspected. In early days, when the production of flour was not large, the draft flour thus taken out, amounted to but little, and it was the practice of the inspectors to keep it, as well as receive compensation in money for the inspection. Later, when the production of ffour became large, the draft flour was a matter of consequence. In the statement of the case, it is shown that at the time of the decision, the inspector had received, in draft flour, about 1500 barrels from one firm. In view of the importance of the matter. an action was brought to determine whether he was entitled to it. One of his conten-

tions was the intention of the legislature, in revising the inspection statute and reducing the rate of compensation, to sanction this usage, by incorporating it into the statute.     It never had been law, nor had it ever been reduced to writing in any form.    Judge Lee, in delivering the opinion of the Court, said:  "But it is contended that if the custom cannot operate *proprio vigore* to vest the right claimed in the inspector, yet that it has been sufficiently recognized by statute and thus has received the legislative sanction.    Certainly if it has been recognized either expressly or by necessary implication it would thereby receive vitality, and the right claimed could well be asserted as conferred by the statute."    But, upon investigation, he found that the statute had not, by any terms used, or in any manner, recognized, mentioned or referred to the custom.    The language of the statute under consideration here is clearly within the reasoning of Judge Lee.    The statute mentions the amendment. In March, 1815, Congress passed an act entitled "An act to vest more effectually in the State courts, and the District Courts of the United States, Jurisdiction" in the cases therein mentioned.    It will be observed that the purpose of the act as indicated by its title, was to deal with a matter of jurisdiction in the state courts and the district courts of the United States.    No reference is made in the title to the circuit courts of the United States, and the jurisdiction intended to be conferred was not a jurisdiction which the circuit courts had under any other statute.    Notwithstanding this, the fourth section of the act declared  "that the district court of the United States shall have cognizance, concurrent with the courts and magistrates of all states, and the circuit courts of the United States, of all suits at common law, where the United States, or any officer thereof, under the authority of any act of Congress, shall sue, although the debt, claim, or matter in dispute, shall not amount to $100.-00."    Chief Justice Marshall said:  "The jurisdiction of the district-courts, then, over suits brought by the Postmaster-General for debts and balances due the general post-office, is unquestionable.    Has the circuit court jurisdiction?    The language of the act is, 'that the district court shall have cognizance concurrent with the courts and magistrates of the several states, and the circuit courts of the United

States, of all suits,' &c. What is the meaning and purport
of the words 'concurrent with' the circuit courts of the
United States? Are they entirely senseless? Are they to
be excluded from the clause in which the legislature has in-
serted them, or are they to be taken into view, and allowed
the effect of which they are capable? The words are cer-
tainly not senseless. They have a plain and obvious mean-
ing. And it is, we think, a rule, that words which have a
meaning are not to be entirely disregarded in construing a
statute.. We cannot understand this clause as if these words
were excluded from it. They, perhaps, manifest the opinion
of the legislature, that the jurisdiction was in the circuit
courts, but ought, we think, to be construed to give it, if
it did not previously exist. Any other construction would
destroy the effect of these words. The district court cannot
take cognizance concurrent with the circuit courts, unless
the circuit courts can take cognizance of the same suits.
For one body to do a thing concurrently with another, is to
act in conjunction with that other. The phrase may imply,
that power was previously given to that other; but if, in
fact, it had not been given, the words are capable, of im-
parting it. If they are susceptible of this construction,
they ought to receive it, because they will otherwise be
totally inoperative, or contradict the other parts of the sen-
tence, which show plainly the intention, that the district
court shall have cognizance of the subject, and shall take
it to the same extent with the circuit courts. It has been
said, and perhaps truly, that this section was not framed
with the intention of vesting jurisdiction in the circuit
courts. The title of the act, and the language of the sen-
tence, are supposed to concur in sustaining this proposi-
tion. The title speaks only of state and district courts. But
it is well settled, that the title cannot restrain the enacting
clause. It is true that the language of the section indicates
the opinion, that jurisdiction existed in the circuit courts,
rather than an intention to give it; and a mistaken opinion of
the legislature concerning the law, does not make law. But
if this mistake is manifested in words competent to make
the law in future, we know of no principle which can deny
them this effect. The legislature may pass a declaratory
act, though inoperative on the past, may act in future. This

law expresses the sense of the legislature on the existing law, as plainly as a declaratory act, and expresses it in terms capable of conferring the jurisdiction. We think, therefore, that 'in a case plainly within the judicial power of the federal courts, as prescribed in the constitution, and plainly within the general policy of the legislature, the words ought to receive this construction." *Postmaster General* v. *Early,* 12 Wheat. 136. In *South Ottowa* v. *Perkins,* 94 U. S. 260, Mr. Justice Bradley said, in speaking of an act of the legislature of Illinois which referred to a previous unconstitutional act as being in force, "The legislature could not thus in 1869, give validity to a void act as an Act passed in 1857, which was not constitutionally passed in that year; for that would be an evasion of the Constitution. It could at most give it vitality as a new Act from the date of the Act of 1869. But this it does not profess to do; it only adopts its provisions for the purposes of the Act then passed." Unlike the statute we are construing, the new statute, discussed by Mr. Justice Bradley, simply referred to the provisions of the unconstitutional statute as having been "in force Feb. 18, 1857." It did not purport by its terms to adopt that statute, nor to express legislative will as to its future status. If it had, it is plain from the language used by the Justice that it would have been operative from the date of the passage of the act of 1869, therein incorporating it. The doctrine of *Postmaster General* v. *Early* was stated with approval by Mr. Justice Strong in *United States* v. *Claflin,* 97 U. S. 546, 24 Law Ed. 1082-83. It is to be observed with reference to the statute construed in *Postmaster General* v. *Early,* that it used no word stating in a formal manner, that the circuit courts shall have jurisdiction. It says the district courts shall have concurrent jurisdiction with the circuit courts, merely assuming that the circuit courts already had jurisdiction, and not saying that they should have. This is true of the statute we are considering, in so far as it relates to the amendments made by the circuit court; but while it does not say in so many words the amendment shall be law in the future, it makes the amendment a part of the statute. It incorporates it into the statute. Can we say the legislature had no purpose in doing that? The rules hereinbefore stated forbid this. Shall we

say the legislature thus adopted it to have effect in future, if the courts should determine that it originally was valid and to have no effect if they should say it was originally invalid? This interpretation might do, if the clause in question were a mere proviso or saving clause, relating to past acts, done under the amendment, but I have shown, I think, conclusively, that it is not; but is, on the contrary, a new and independent clause, adding to what precedes it, and not merely limiting or qualifying it after the fashion of the proviso or exception. Let it be remembered that this conclusion would render the clause non-effective. If valid, it would remain so without the aid of this clause. If invalid, this clause, so construed, would still leave it invalid. How could we reconcile this view of conditional adoption with the doctrine laid down in *Postmaster General* v. *Early?* It would be absolutely impossible to do so. Let it be remembered, too, that the doctrine of that case is not mere *obiter*, but matter of express and solemn decision and application of the principle. How could we reconcile it with the expression of the opinion of Judge Lee in *Delaplane* v. *Crenshaw*, an *obiter dictum*, it is true, but one pregnant with reason and emanating from one of the ablest jurists of his time? How shall we wipe out this doctrine in the face of its recognition and approval by the Supreme Court of the United States in comparatively recent cases? Though the authorities cited would be amply sufficient to justify the position I have taken, they are by no means the only authorities upon that question. *State* v. *Corker*. 67 N. J. L. 596, (60 L. R. A. 564,) propounds the doctrine that if a document of any kind be incorporated into a statute by any reference sufficient to identify it, it becomes as much a part of it and as effective as a part of it,—as if it were copied into it with positive and affirmative declarations of legislative will. In that case, the question was whether an unconstitutional statute had been validated by a statute subsequently passed. The court said: "For the purposes of this case it may be conceded that the unconstitutional provisions referred to were inseparable from the legislative intent, so that in each case the entire statute was unconstitutional. The question raised, therefore, is fairly presented. The argument is that an unconstitutional statute is a nullity. Granting this,

it does not follow that it may not be imported into valid legislation by appropriate reference. It is entirely within the legislative power to give effect to documents without their full recital. Statutes valididating agreements of lease, merger, or consolidation of railroad corporations are usually cast in that form.  *  *  * The matter is one purely of identification. Surely nothing can be more definite than a reference to a document that has been regularly promulgated as a public statute." The act in question in that case was an act concerning public roads and lights and creating boards for the control and management of the same. In providing for the election of road commissioners, the statute undertook to limit the right of franchise to the freeholders of the respective townships. The Supreme Court said that, as the qualification of voters was fixed by the constitution, and the right of franchise extended to all persons who could bring themselves within the constitutional qualifications, and the right to vote was not limited to freeholders, the statute was for that reason unconstitutional and void. In 1896, an act was passed, not incorporating the whole of that statute, nor saying that, from and after the taking effect of the act of 1896, the unconstitutional Act of March, 1893, should, as amended by the act of 1896, thereafter have effect, but merely amending the objectionable sections in the act of 1893. In *State* v. *Corker*, it was held that, although the act of 1893 may have been wholly void because of the unconstitutionality of the provisions of certain sections, the elimination of these objections by the act of 1896 validated the whole of the act of 1893, although the other portions of that act, were not re-enacted, incorporated into the new statute, nor expressly adopted by reference. The court simply held that the intention of the legislature to put the act into future force was plainly manifested by the striking from the void statute, of that which had made it void, although it did not use express language, or the legislative terms usually employed for that purpose. In other words, the act of 1896 did not expressly declare that the whole of the act of 1893 should thereafter have the force of law, or should be deemed to have been in effect since the first of March, 1893, and continue to be law, but simply amended sections of it, and put them in force, and the court said this suffi-

ciently manifested intention to put the whole act into effect.
How much stronger is the present case? Section 40 of
chapter 40 of the acts 1891 assumes that the amendments
made by the circuit court of Mason county vested power in
the town council and says nothing in this act shall be con-
strued to take away those powers. Add to this reasonable
and common sense view the consideration that, if the pur-
pose of this clause was not the adoption of these amend-
ments, it could not have any purpose and could not be in
any sense or degree effective, and thus apply the well set-
tled and universal rule of construction. To this add the
further consideration that the purpose of the act was the
provision of a new and complete system of government for
the town of Point Pleasant, and the method of executing
that purpose was not the building, upon former laws as a
substructure, of a mere superstructure, but the laying of
new foundations, and the building from the ground up of
a new and complete structure, using only such of the old
materials as were deemed suitable, so that the work con-
sisted of construction and erection, not mere alteration or
remodeling, and, in all substantial respects, of the process
of inclusion, not exclusion, nor of the double process of in-
clusion and exclusion; and the position I have taken, so well
sustained by the principles adverted to, becomes im-
mensely strengthened by another well settled rule of inter-
pretation.

In my opinion, it is immaterial that the amendment, ad-
mittedly void for the purpose of this part of the opinion,
was in the form of a court decree and not of a statute.
Void deeds and contracts, often validated by statute, are
never in statutory form. The custom in question in *Dela-
plane* v. *Crenshaw*, cited, was not even reduced to writing,
nor was there any memorandum of the supposed circuit court
jurisdiction, assumed in the statute, under consideration in
*P. M. Gen.* v. *Early*, cited. It was a mere figment of the
legislative mind. In *Chappell* v. *United States*, 81 Fed.
Rep. 764, an Act of Congress, declaring the state laws
should govern the practice in the federal courts sitting in
the several states, was under consideration, and the fact that
the laws so adopted were not federal laws, but laws of a
different jurisdiction, was regarded as immaterial. A stat--

ute of New York, adopting certain provisions of an unofficial book, known as the Revised Statutes, and not found in the official Revised Statutes, was sustained, and the adopted matter held to be a part of it.     *Will of Kavanaugh*, 125 N. Y. 418.   Nor has section 30 of Art. VI of the Constitution anything to do with the case.   This is not a case of revival of a repealed statute, or amendment of an existing one, by reference to its title or otherwise.     *State* v. *Corker*, cited; *State* v. *Cain*, 8 W. Va. 720.

In view of the conclusion to which a majority of the members of the court have come, sustaining the Harden license on the provisions of the act of 1891, I see no necessity for any discussion of the validity of the amendment made by the circuit court in 1883.   The validity of no act done under that amendment between 1883 and 1891 is in question.   The act of 1891 is clearly a substitute for all the laws, relating to the powers of the council of the town of Point Pleasant, that were in force and effect at the date of the passage of that act.   To that act, and such other laws, general and special, as have been adopted by it, we must look in ascertaining what powers the town has, and not elsewhere.   But, in view of the argument and opinion expressed by JUDGE MILLER in a dissenting opinion, I feel constrained to say something on the subject, lest my silence should be taken, by the profession, as a concurrence in the views expressed by him, or as indicating a lack, on my part, of any good reason for not concurring.   I do not want to be regarded as having been silent from mere obstinacy.   Nor do I wish to feel the necessity in any way of explaining my attitude, on any future occasion, requiring action on this matter, should one arise.

The constitutionality of chapter 47 of the Code, passed by the legislature in obedience to, and by way of execution of, section 39 of Article VI of the Constitution, requiring that body to provide, by general laws, for the incorporation of cities, towns or villages, containing a population of less than two thousand, or for amending the charters of such cities, towns and villages, has been declared by this Court.   *In Re Town of Union Mines*, 39 W. Va. 179, the Court held as follows:   "Chapter 47 of the Code, in relation to the incorporation of cities, towns, and villages, in

so far as it confers on the circuit court functions in their nature judicial and administrative, although in furtherance of the legislative department of the state government, is constitutional and valid." The same declaration has been made in exactly the same language in *Elder* v. *The Incorporators of Central City,* 40 W. Va. 222. In both of these cases, this Court declined appeltate jurisdiction over proceedings in the circuit courts for the incorporation of cities, towns and villages, under the provision of chapter 47 of the Code, on the theory and express holding that the action of the circuit court was only *quasi* judicial, or that, if it was not *quasi* judicial, it was an administrative function, the conference of which upon circuit courts was expressly authorized by the Constitution. In the former case, JUDGE DENT said: "In discharging these functions, the circuit court does not act under the judicial branch of the government and is not subject to its supervision, except by *mandamus* or prohihition in a proper case, but acts as a part of the legislative branch of government under the express authority of the constitution and is subject to its supervision and control only, however, by impeachment or amendment or repeal of the law. Hence its action in discharging these legislative judicial functions can not be reviewed by this Court by a writ of error or other ordinary appellate writ, notwithstanding their judicial character." The second point of the syllabus in that case declared the same doctrine in these words: "The circuit court, in the discharge of such functions, acts as a subordinate branch or tribunal of the legislative, not of the judicial department, and is not subject to the appellate jurisdiction of the Supreme Court of Appeals of this State." This part of the syllabus is not repeated in *Elder* v. *Central City,* cited, nor is the language of the opinion of the Court to exactly the same effect. JUDGE HOLT says, by way of conclusion, "But the majority of the Court being of opinion that the matter is only administrative, and that this Court has no jurisdiction in a matter merely *quasi* judicial, the writ of error must be dismissed as improvidently awarded." Notwithstanding the declination of appellate jurisdiction in these two cases, they seem to decide whether or not the statute, purporting to confer jurisdiction upon the circuit court, was constitutional. Under

that statute, the circuit court had, in each case, exercised jurisdiction. If the statute did not confer jurisdiction, because unconstitutional, in so far as it authorized, or attempted to authorize, action in the matter of incorporation. by the circuit courts, then the circuit courts had acted without jurisdiction, and their want of jurisdiction itself and alone may have conferred appellate jurisdiction on the Supreme Court. *Freer* v. *Davis*, 51 W. Va. 1; *Clark* v. *County Court*, 55 W. Va. 278. In this last case, Judge Miller said: "Where the subject matter in controversy is sufficient, and the bar of the statute has not intervened, the right of a party to a void judgment or decree, to have the same reviewed and reversed, if prejudiced thereby, is unquestioned." However this may be, even though these declarations, tested by strict law, be mere *dicta*, I think the reasoning for the conclusion is well, clearly and correctly, but tersely stated by Judge Holt in *Elder* v. *Central City*. He says: "The statute itself erects the local body of citizens into a municipal corporation upon their bringing themselves within its provisions and upon complying with its terms, all of which are specific and fixed therein (see Thomp. Corp., section 110 *et seq.*); and whether the facts thus required exist in the particular case the circuit court, after due notice to all concerned and an opportunity to be heard against the application, ascertains and determines. This is, at least, an administrative or *quasi* judicial function, which the circuit court may be authorized to perform. See latter clause of section twelve, article eight, Const." In saying the statute itself erects the local body of citizens into a municipal corporation, upon bringing themselves within its provisions, and upon complying with its terms, Judge Holt not only adhered to the language and spirit of the statute, but stated what is characteristic of many grants, rights and powers, made by the legislature, and conferred by the common law. His meaning is that the grant of the right to be a corporation, and to have corporate powers, is complete and final so far as the legislature is concerned, there remaining nothing to be done by it. It is a grant of a right to such people as are able to bring themselves within the conditions annexed to it, and as shall actually do so. It is not a grant without conditions. It is not a self-executing statute,.

it is true, but it is a grant to the people, to. become effective upon their bringing themselves within its terms and conditions, without any further action on the part of the legislature. How broad is the application of this principle when we come to think about it? The laws of descent and distribution, the providing for the alienation of property by deed and will, the laws providing for the incorporation of private joint stock companies, about the constitutionality of which there can be no possible question, involve this same principle. No person can inherit or take, under the statutes of descent and distribution, until he comes within the conditions annexed to the grant of the right of inheritance. Can we say that these statutes are self-executing, and have already vested rights to property in persons who are not yet born? . As to these persons, as well as to those who are now in being, the rule declared by law exists. The only difference is, that those who are now in being are within the conditions of the rule, while those who are not yet born have not come within its conditions. As to the former, the right has become concrete, absolute and unconditional; as to the latter, it exists conditionally and in the abstract. It is a law, however, in each case, prescribed by the power of the state. It is a rule of action, actually in operation, vesting rights in persons now living, and determining in advance the rights of those who shall hereafter come into being. Take the statute providing for the incorporation of private corporations. Almost any sort of a corporation can be organized under the general laws, but they do not exist until after organization and, in the organization of them, the legislature does not participate. It has fully and completely performed its function, by prescribing the rule and laying down the conditions, to be complied with by those who desire to avail themselves of the right which the legislature has given to be a corporation. They must, in order to vest themselves with corporate powers, enter into an agreement, the form and substance of which is prescribed by the statute; they must sign that agreement and acknowledge it; they must deliver it to the secretary of state, together with a certain amount of money and he then issues the certificate of incorporation. Nobody pretends that the secretary of state organizes the corporation or grants the power to be a cor-

poration, or exercises any legislative power whatever.
His issuance of the certificate is but the performance of one
of the conditions upon which the legislature has said, in ad-
vance, the right to be a corporation shall be dependent. Now
that statute says any number of persons not less than five
may form a corporation in that way. Such persons as see
fit to organize corporations only avail themselves, by organ-
izing it, of a right granted to any other equal number of
persons to do the same thing. As the organization of a
private corporation is always a matter of agreement and
there is nothing to settle between the parties who organize it,.
that they cannot settle among themselves, there was no ne-
cessity for the interposition of any third party to settle
differences among them. As it must be a matter of agree-
ment, there can be no differences to settle. It is a matter
of agreement or no corporation. This is not true in the
case of the incorporation of municipal corporations. If
those desiring the formation of such a corporation had to
wait until every man in the territory, proposed to be in-
corporated, should agree to it, very few corporations of that
kind would ever be formed. That was apparent to the legis-
lature. Hence, the necessity for a provision to meet this ex-
igency, differing from the provision made in the case of
private corporations. But this does not betoken or argue
that the principle underlying the grant of the right to be
a municipal corporation differs from the principle on which
the grant of the right to be a private corporation operates..
It is simply a difference in the mode prescribed for taking
the benefit of the grant. It is simply the requirement of
compliance with an additional condition, annexed to the
grant, because, from the very nature of the thing granted,
it was necessary to prescribe a further condition, in order
to make the grant effective and fruitful. Now, what does
the statute say? Simply that the inhabitants of any territory,
in any county, not less than one-quarter of one square mile
in extent, and numbering not less than one hundred persons,.
may, by pursuing a certain course, convert themselves into
a body politic and corporate, for the benefit of the public,
and, incidentally, themselves and such other persons as
may see fit to reside in the same territory along with
them, whether born or yet to be born, so long as the cor-

poration shall continue to exist. The various steps by which this is accomplished, the enumeration of the conditions to be complied with, to enable these people to obtain the benefit of the grant, hardly need to be fully set forth. They are required to cause a census to be taken, showing the population of the territory, a survey and map to be made, notice to be given of the intention to make application to the circuit court for the certificate of incorporation, and an election to be held, to determine whether it is the wish of a majority of the qualified voters of the territory, to take advantage of the right of local self-government by means of municipal corporation. Whether these things have been done in a given case, are mere matters of fact, but it was apparent to the legislature that there might be disagreement as to the state of facts, and attempts on the part of the minority to override the will of the majority, by means of fraud or trickery. Therefore, it was necessary to authorize some person or tribunal, in addition to issuing a certificate, to settle any such disagreements, and to ascertain, in an authoritative manner, what the facts are, whether the population of the territory is sufficient, whether a fair expression of the will of the voters has been taken, and what their will is. Is not this investigation and determination such in character as is peculiar to courts, rather than to legislatures or executive officers? Is it strange, then, that the legislature should have chosen, for this purpose that tribunal which the experience of all ages and all people has fixed and developed as the most appropriate, and best qualified one for determining such questions, and performing such functions, namely, a court of general jurisdiction? Now, as the matters to be determined by the court are not those of rights between man and man, such as property rights and relative rights of personal status, the determination of them may not, and probably is not, judicial in the full sense of the term, but as has been said by JUDGE HOLT, the function is in the nature of a judicial one, a *quasi* judicial function and jurisdiction. However that may be, the thing ultimately determined by the Court is not whether the people of that territory have a right to be a corporation. That, the legislature has said to all the people of the state, who are within the conditions annexed. The thing determined by the Court

is whether the people desiring to form such a corporation, have put themselves within the conditions which the legislature has said shall be complied with, before the grant shall become effective, just as it determines whether a man is within the conditions which the law says make him an heir to property. That, in awarding the certificate, the court performs a mere ministerial function, not in any sense legislative, after having incidentally determined, judicially or *quasi* judicially, that the conditions have been complied with, just as the secretary of state issues a certificate of incorporation to a joint stock company, after having ascertained that the applicants for that certificate have performed the conditions, which the legislature has said they should perform, as a means of availing themselves of the right granted, seems so clear to me that I do not see how any person could doubt it.

In view of the peculiar nature of a municipal corporation, and the respects in which it differs from a private corporation, the legislature saw fit to impose another condition, not wholly dependent upon the will of those desiring to form the corporation, nor within their power to perform. That was couched in these terms, "the circuit court may, at its discretion, by an order entered of record, direct the clerk of said court to issue a certificate of the incorporation of such city, town or village," in substantial agreement with a form prescribed by the statute. This may authorize the withholding of the certificate after all the other conditions have been complied with. Whether it does or not, we are not in condition now to decide, for the question is not before the Court. But, assuming that it does, what of it? Is this power to grant it or withhold it, in the discretion of the court, legislative power? Not by any means. It is a mere matter of approval or disapproval on a view of the whole situation, after having heard the parties pro and con, annexed to the grant as another condition. It is not full, nor unlimited discretion over the subject matter. It gives no authority to issue the certificate, if the other conditions have not been performed. It is a discretion to refuse only, not to grant. Legislative discretion and power includes both. Suppose a philanthropist, in donating a hundred thousand dollars to some city or town, for the erection of a library,

on condition that the city or town contribute to the fund
an additional hundred thousand dollars, and agree to main-
tain the library, and on the further condition, that some
person agreed upon between him and the authorities of
the town, or named by him alone, shall be of opinion
that, under all the circumstances, it is advisable for
the philanthropist to make that particular donation. Sup-
pose the third party says no. Does he withhold the
gift or defeat the donation? By no means. The do-
nation is defeated under a clause in the offer or grant of the
donation, by a contingency which has arisen, and which was
anticipated and intended to defeat it, if it arose. Its defeat
was predestined and foreordained from the inception of the
transaction. Suppose the third party gives his approval and
the gift is effectuated. Now, who made that gift? Did the
third party make it, or he out of whose coffers the hun-
dred thousand dollars came? The answer to this question
is so self-evident and apparent as to make it almost useless
to say the grant was made by the latter, and that he merely
loaded it down with a condition. So here, the grant is
made by the state, although the approval of the circuit court
was made a condition upon which it should become effective.
Now what the nature or extent of this discretion is, it is un-
necessary to discuss, but it may be suggested that it was
apparent to the legislature, that there might be a doubt in
the mind of the court, as to whether some of the conditions
to be performed by the citizens had been complied with—
whether for instance, a fair expression of the will of the
people had been taken, the court being powerless to order
another election,—whether the requisite territory was in-
cluded, there being no authority in the court to order a new
survey,—whether the census was fraudulent or true, no
authority having been given to order the taking of a new
census. It may be also that it occurred to the legislature,
that there might be communities in which, owing to the il-
literate or vicious character of the inhabitants, contrary to
the normal conditions, prevailing in the state, in which the
power of local self-government would be dangerous, rather
than beneficial, and ought not to be had. The legislature
may well have assumed that, contrary to the usual conditions
prevailing, under which the circuit court would have no

hesitancy, and ought not to have any hesitancy, in complying with the expressed will of the majority, in granting a certificate of incorporation, there might be abnormal conditions in certain communities, due to the presence of a large and vicious population, inhabiting the particular territory, temporarily, in which the right of local self-government would be abused and prostituted to improper ends and purposes, injurious to the public, and in which the application, though having the form of a proper one, should not have been made in good faith. Would not this make the effectuation of the grant depend upon a question of fact or law to be determined by the circuit court, even under this clause of the statute, and not upon the arbitrary will of the court? Is it not the duty and province of courts to construe statutes and enforce them according to the legislative intent, viewing them in the light of the subject matter and the legislative policy, disclosed by the terms and purposes of the statutes? Would the rules of construction be violated or strained by saying the legislature never intended to bestow the right under such circumstances? This construction would eliminate the element of arbitrariness on the part of the court. The court would thus declare, not its will, but the will of the legislature. But suppose it were dependent upon the arbitrary will of the judge of the court, would it be any the less a condition? Any man in the state has a right to operate a ferry if he puts himself within the conditions annexed by the law giving the right. Yet, the courts may, in their discretion, say he shall not exercise that right—that the conditions do not warrant it and that it, therefore, refuses the permission. Is that the exercise of legislative power? Not at all. The proceeding commences in the county court and may be continued, by appellate process, into the Supreme Court, and yet the thing sought is nothing more than a right conditionally granted by a legislative act, and the condition is approval by the court, on a view of all the facts and circumstances. *Ferry Co.* v. *Russell*, 52 W. Va. 356; *Williamson* v. *Hays*, 25 W. Va. 609. The broad discretion vested in the county court, is given in these words, "to determine whether the ferry ought to be established or not." In *Ferry Co.* v. *Russell*, JUDGE BRANNON, speaking for this Court, said: "The evidence does not show that the travel

will support three (ferries); it shows that it will not. * *
* Another element in the question is, that Russell had a
ferry granted by authority, and it is property, and the re-
port and evidence show that it will be injured by the pro-
posed ferry. You say that his property cannot bar the pub-
lic need. I say so too; it cannot bar it, but it goes into the
scales." Where did the Court get this? Not from any ex-
press words of the statute. It is merely the dictate of rea-
son and common sense, which the court rightly assumed
the legislature intended to make a part of the statute,
and to have weight with the court in determining whether
the ferry ought to be established. It is found in the
statute by construction. What rule of law forbids a like
exposition and enforcement of chapter 47 of the Code?
If it be so construed, how does it confer any legislative power
on the court?

All discretion is not legislative discretion. Every man in
the exercise of his private powers and rights exercises
discretion. In doing so, he neither becomes a judge nor a
law-maker. Many discretionary powers are vested in the
executive officers of the state. All the courts possess and
exercise discretionary powers. How often has it been said
by this Court that certain actions of the circuit courts were
within their sound discretion and therefore not reviewable.
How often do we find matters left, by the legislature, within
the discretion of the governor, the auditor, and other execu-
tive officers? Discretion does not belong peculiarly to any
department of the government. On the contrary, it is essen-
tial to the due and effective execution of the powers of each
of the three great departments. There are many instances
in which the governor has before him transactions, which
possess all the forms and appearances of judicial proceed-
ings. In the execution of his power to remove subordinate
officers, for cause or without cause, he often brings them
before him on a specification of charges and hears evidence
in some form. The hearing of interested parties. before
acting in respect to any particular matter, is characteristic of
the legislature, of the courts and of the executive. The hear-
ing given by the governor in such a case, however is not a judi-
cial hearing, and, in removing a man from office, he does not
act judicially. The function is purely an executive one. The

investigation and hearing given, as a preliminary step, although judicial in form, and although *quasi* judicial in nature, is a mere incident of the exercise of the executive power to remove. Does the legislature act judicially, when it gives a hearing before a committee for the purpose of obtaining information and procuring formal recommendations, concerning the subject matter of a proposed law? Not at all. Take the case of a county court, sitting as a board of canvassers, and performing a purely ministerial function, in the ascertainment of the true returns and declaration of the result of the election. This Court in *Brazie* v. *Commissioners*, 25 W. Va. 213, declared that, in the performance of this ministerial duty, the commissioners incidentally perform a judicial function, but that function was so purely subordinate as not to change the character of the ministerial power to which it was incident.

Moreover, the separation of the executive, legislative and judicial powers of the state, enjoined by the Constitution, is not such an absolute separation as to make these powers independent. They are co-ordinate, working together and carrying into effect conjointly the sovereign power of the state. Though touching one another at all points, and knitted together just as are all parts of the human body, each performing its peculiar function, all three must be in constant operation and be to some extent united. Lewis. Suth. Sta. Con., section 2, says: "This separation is deemed to be of the greatest importance; absolutely essential to the existence of a just and free government. This is not, however, such a separation as to make these departments wholly independent; but only so that one department shall not exercise the power nor perform the functions of another. They are mutually dependent, and could not subsist without the aid and co-operation of each other. Under the constitutions, the legislature is empowered to make laws; it has that power exclusively; the executive has the power to carry them by all executive acts into effect, and the judiciary has the exclusive power to expound them as the law of the land between suitors in the administration of justice. The legislature can do no executive acts, but it can legislate to regulate the executive office, prescribe laws to the executive which that department, and every grade of

its officers, must obey. The legislature cannot decide cases, but it can pass laws which will furnish the basis of decisions, and the courts are bound to obey them. The functions of each branch are as distinct as the stomach and lungs in our bodies. They are intended to co-operate; not to be antagonistic; they are functions in the same system; when each functionary does its appropriate work no interference or conflict is possible." Story, in his work on the Constitution, at section 525, says: "When we speak of a separation of the three great departments of the government, and maintain that that separation is indispensable to public liberty, we are to understand this maxim in a limited sense. It is not meant to affirm that they must be kept wholly and entirely separate and distinct, and have no common link of connection or dependence, the one upon the other, in the slightest degree. The true meaning is, that the whole power of one of these departments should not be exercised by the same hands which possess the whole power of either of the other departments; and that such exercise of the whole would subvert the principles of a free constitution. This has been shown with great clearness and accuracy by the author of the Federalist." In *Wheeling Bridge and Terminal Railway Co.* v. *Paull*, 39 W. Va. 142, this Court expressed the same idea in the following terms: "But the constitution, within itself, after the declaration of this general doctrine, proceeds to make many laps of the various departments, so as to make them mutually dependent upon and supporting each other; thus welding them into an harmonious whole, or three distinct departments in one, for the preservation, at the smallest expense possible, of the largest freedom of individual rights consistent with the general welfare. Were it practicable to keep these three departments wholly distinct, the increase of the necessary offices and officers would be so great, and the expense thereof so burdensome, as to render the cost of the administration of the government unbearable, especially to the citizen taxpayer who must contribute and yet not share in the distribution of the taxes. So that, while we find that the Constitution, as much as possible keeps the heads of the three departments comparatively distinct and independent of each

other, yet as we move down the scale these several powers become interwoven with each other, until we find the common council of every village exercising legislative, executive and judicial functions, indiscriminately, by authority of the same constitution which declares that these functions shall be kept distinct."

In view of this interpretation of the declaration of the constitution that the three departments of government shall be kept separate, what does it signify that there is a scintilla of legislation in the function performed by the circuit court in granting a certificate of incorporation, if, indeed, there be one? It is not an exercise of the whole of legislative power, respecting the organization of municipal corporations. The grant of the right, by the legislature, to the people to be a corporation is the principal element in the erection of a body politic and corporate. The function performed by the court is of minor and secondary importance and would be wholly ineffective and futile, but for the grant made to the people by the legislature. Moreover, the court has no power of initiation. The statute gives it no power to impose, upon people who have not asked for it, the organization of a corporation. Furthermore, it has no discretion to grant, but only to refuse, the certificate. Can this be the exercise of the whole legislative power over the subject? But I do not concede that there is even a scintilla of legislation in the function performed by the circuit court. It simply hears the interested parties, those who come forward professing to represent a majority of the votes of the community, demanding as against the minority, a right which the legislature has given, and the remonstrances of the minority, asserting that the conditions upon which the legislature declared the right should rest, do not exist. The latter may show among other things that the survey, census and election were fraudulent. They may show in addition to this, or without this, that the whole population of the community, with the exception of one man, are mere tenants of that one man under a lease which will expire in two years or less time, and that the sole purpose of the applicants for incorporation is the burdening of that one man's property with taxation, and that the affairs of the proposed corporation, after it shall have been organized,

will be so manipulated by these people as to give themselves the benefit of the taxation, through the filling of useless lucrative offices, provided, and otherwise. To meet such a case of bad faith and abuse of the law, accidental and unusual in its circumstances, and putting the application beyond the purpose of the statute, the legislature might well have said that the circuit court should have power to refuse the certificate of incorporation, in its discretion, and, because of the impossibility of laying down rules for all the abnormal conditions which may be found to exist in the numerous communities of the whole state, we may well say that the legislature necessarily employed the phrase "in its discretion," intending that the court should regard the survey, census and expression of popular will, as making out a *prima facie* case, to meet conditions ordinarily found throughout the state, but to be overthrown by proof of abnormal or extraordinary conditions prevailing in a given community. This makes the function performed by the court a mere judicial determination of questions of fact, and declaration of law, according to legislative intention, expressed in the statute. What then, does the certificate of incorporation amount to? Not the grant of the right to be a corporation. Merely a declaration, ministerial or judicial, that the conditions, annexed by the legislature to the grant, have been found by the court, to have been performed, in so far as any duty was devolved by the act upon the inhabitants of the territory, and to have existed, in so far as they were conditions not within the control, or dependent upon the will, of the inhabitants. Is it not the duty of the court to give effect to a statute, by such construction as will make it constitutional, when it is possible to do so? Can not the words "in the discretion of the court," being general, and necessarily so, owing to the impossibility of naming every possible exigency and condition with which the court may be confronted on these applications for incorporation, be so construed as to leave not even a modicum of legislation in its action? If necessary to do so, in order to effect such an elimination, can we not say that the legislature intended, in the absence of the disclosure of some peculiar circumstance, showing abnormal conditions, that the court, upon an application, showing

the requisite territory and population and expression of the will of the voter, so clearly as to leave no doubt, is bound to grant the certificate of incorporation; and that its discretion to refuse amounts to nothing more than the power of declaring judicially that the *prima facie* case, made by such showing, has been overcome by proof of peculiar circumstances, intended by the legislature to overthrow it? That no mode of review has been provided, is wholly unimportant. Is not the action of a justice in rendering a judgment for less than fifteen dollars, and of a circuit court in rendering one for less than fifty dollars, judicial action? No appeal lies in either case. No doubt scores of other illustrations could ·be given. Nor does it argue anything that a right of review is given in ferry cases.

It is plain, in respect to the organization of municipal corporations, that the legislature devolves upon courts only the duty of settling questions of fact and declaring the law thereon, just what it does in cases of pure judicial cognizance. An illustration of the application of the same principle is found in the statute enforcing the power of eminent domain. The appropriation of private property to public use is made by the assertion and exercise of the power of the legislature, not the power of the courts nor of the persons or corporations to whom the property is turned over for public use. The power of the court is interposed for no other purpose than to determine judicially, whether the applicant has put himself within the conditions annexed by the legislature, to the grant of the right to one man to take and use the property of another for the particular purpose in question. It must be a public use or purpose. What is a public use is a question left ordinarily to the determination of the court. It cannot be taken except upon payment of just compensation. What is just compensation is left to judicial determination. In this case, the court has no power of initiation. It makes no grant of any right. It creates nothing, ordains nothing. It merely determines questions of law and fact arising in the execution and carrying into effect of the grant made by the legislature. Its order, declaring that the use for which the property is sought is a public use, and that the compensation ascertained

is a just compensation and has been paid, is logically and substantially nothing more than a certificate to the effect that the conditions annexed to the grant have been performed or exist. Of course, the same questions do not arise in the two cases, for there is a dissimilarity in the subject matter, but is it not plain that the principle in each case is exactly the same? Take as another illustration the appointment of trustees to hold the title to property belonging to religious congregations. Under section 47 of Article VI of the Constitution, declaring that no charter of incorporation shall be granted to any church or religious denomination, but that provision may be made by general laws for securing the title to church property, and for the sale and transfer thereof, so that it may be sold, used, or transferred for the purposes of such church or religious denomination, the legislature passed chapter 57 of the Code, providing for the appointment of trustees by the circuit courts, to take and hold the legal title to such property. The object of this statute was to enable religious congregations and denominations to have a means of preserving a record of the legal title to their property and to have that title vested in somebody so that the property might be protected, by all proper actions and legal proceedings in the name of the trustees, and conveyances thereof made, as other property is protected and handled. It was made for the benefit of religious congregations. It was a grant by the legislature of a right to them. It was the execution, by the legislature of its sovereign power vested by the constitution, to regulate the holding of real property by religious denominations. It does not force upon them the duty of appointing trustees and so fixing in them the legal title. It extends the right to do so. It is a grant of a right by the legislature to religious denominations and congregations. They must be such bodies so as to come within the conditions prescribed by the statute, and an application must be made for appointment of trustees. Now this jurisdiction to appoint such trustees as well as trustees for secret orders, colleges, academies, high schools, sons of temperance, orphan asylums, children's homes and other benevolent associations, is exercised by the circuit courts throughout the state and has been since the adoption of the constitution and even before.

The circuit court is, by this statue, made a mere ministerial agency through which such institutions may claim the right granted to them by the legislature. It is difficult to see any element of judicial power in them. There may be none. The duty appears to be purely ministerial, and it is vested in a court of general jurisdiction. In some instances, the exercise of this power calls for action *quasi* judicial in its nature. There may be controversies to settle as to whether the institution is of the kind mentioned in the statute, whether the person appearing on behalf if it has been authorized to make the application, whether the persons designated by him for appointment are persons whom the congregation desires to have appointed. While the determination of such controversies is judicial in form and judicial in nature, it is only *quasi* judicial in truth and in law, because it arises in the performance of a ministerial function by the court. Take as another illustration, the provisions made for the sale of lands of infants, on the theory that their interests will be subserved thereby. Nobody proceeds against the land, nobody has a debt against it or any right to put it to sale. It is not in any sense the ordinary adversary judicial proceeding. The proceeding is merely the means by which an infant exercises the right given him by the statute to make an irrevocable and binding contract of sale of his real estate, when his condition and that of his estate are such that the sale will conserve his best interest. Whether it will or not is a judicial question, referred by the statute to the court, and the court is charged with the further duty of seeing that the requirements of the law, looking to the preservation of the proceeds, are complied with. Many courts designate the function as, the execution of a legislative power. *Ammons* v. *Ammons*, 50 W. Va. 390; *Bright* v. *Boyd*, 1 Story, 478. This is not any more judicial perhaps than is the action of the court in condemnation proceedings or in the appointment of trustees. All these instances and others that could be pointed out show, however, that the work of the courts is not confined strictly and absolutely to matters of pure and unadulterated judicial action in ordinary adversary proceedings. Purely ministerial functions are cast by the legislature on the courts, and in doing so the legislature does not over-

leap any of the bounds set by the constitution. Ministerial
power belongs alike to the executive, legislative and judicial
branches. To say that the legislature shall not confer upon
the circuit court any ministerial powers, not incident to the
exercise of its judicial powers, would be equivalent to
erecting or declaring a fourth department of the gov-
ernment for the officers of which the constitution has made
no provision. It does not say the sovereign powers
of the state shall be divided into four departments,
viz., the executive, legislative, judicial and ministerial, but
only three.

I do not think the general principles declared by the
cases, cited by JUDGE MILLER, as tending to cast doubt upon
the constitutionality of so much of chapter 47 of the Code,
as confers power upon the circuit courts, are in conflict with
the views here expressed; but the application of some of
these general principles, made by the courts in *Norwalk Ry.*
*Company's Appeals*, 69 Conn. 576, (39 L. R. A. 794), and
*In Re North Milwaukee*, 33 L. R. A. 638, may not be ap-
plicable here as persuasive authority, because the terms
of the two statutes construed in those cases were essentially
different from the language of our statute. However, I
think those decisions are unsound. The question decided in
the former case, was stated, by the judge who delivered the
opinion of the court, in the following terms: "The act
of 1893 confers upon city councils certain powers in estab-
lishing regulations for the location, construction, and opera-
tion of street railways, and requires a council, if requested
by a railway company, to take some action within sixty
days, and to notify the company in writing of its action.
Whenever a council fails to give such written notice, the
act of 1895 confers the same powers upon the 'superior
court or any judge thereof,' to be exercised on application of
a railway company, and calls this application an 'appeal.'
The power so conferred on the court is described in the act
of 1893 as the power to approve and adopt a location and
lay out a street railway, with such modifications therein as
shall seem proper, in respect to the streets to be occupied,
the location of the same as to grade and to the center
line of the streets, and changes to be made in the street, the
kind and quality of the track to be used, the motive power

to be used, and the method of applying the same." The part of the statute which that court held void reads as follows: "And whenever such warden and burgesses, mayor and common council, or selectmen shall, under the provisions of section 2 of chapter CIXIX. of the Public Acts of 1893, be deemed to have refused to approve and accept any plan presented by any street-railway company, said street-railway company shall have a like right of appeal therefrom to said superior court, or any judge thereof; and said court or judge shall have the same power with reference to said plan and the acceptance or modification thereof that said principal authorities would have had under the provisions of said act, and may make all such orders with reference thereto as may be deemed equitable." The powers that the principal authorities had under the statute were as follows: to "accept and adopt such plan (the plan proposed by the railway company) or make such modifications therein, as to them shall seem proper." All this had to be read in the light of another clause of the statute which said: "No such company shall construct a railway, lay down tracks, or change its motive power except in accordance with a plan approved by the authorities aforesaid." The court said: "The meaning of the act of 1893, relating to street railways, is uncertain in several particulars; but there can be no doubt that it confers on municipal authorities, in addition to certain executive powers, the power of establishing regulations and conditions (within the limitations prescribed) which shall control all the street railways in the state, in the location, construction, and operation of railways. There can be no doubt that making such regulations is essentially and distinctively a legislative function. It is also certain that the judicial power does not include the exercise of such a legislative function, and that the duty of making such regulations cannot be imposed upon the superior court, because it involves the exercise of legislative power by the court, and because a power in the legislature to impose such duties is inconsistent with the existence of an independent and separate judicial department of government." It is to be observed here that the statute did not expressly give the right to the railway company to occupy the streets otherwise than conditionally, It seemed to make that right dependent solely upon the·

will of the council of the town.    It said: "No such company
shall construct such railway, lay down tracks, or change its
motive power except in accordance with the plan approved
by the authorities aforesaid" (meaning the corporate author-
ities of the town).    On the refusal of permission to occupy
or to alter the mode or extent of the occupation of the
streets, authority was given the court to prescribe the man-
ner and extent of the occupation or alteration.    Here is
where the superior court found fault with the statute and
discovered what is held to be an. attempted conference of
legislative power upon the judiciary.    It seems to me that
the court might well have found the intention of the leg-
islature, as disclosed by the two provisions of the statute, to
grant to the railway companies the right to make these al-
terations, by agreement with the council, if possible, and
if not, then upon compliance with such reasonable conditions
as the court should find and determine to be equitable and
just under the circumstances of the case.    The alterations were
to be made in the public highways, over which the legisla-
ture has absolute power and control with reference to their
use.    The legislature might have given the right to make
such alterations as the railway companies should see fit to
make, not inconsistent with the reasonable use of the high-
ways for other purposes, independently of any action or
wish of the council.    Having the power to grant such ab-
solute right, why could it not grant the same right to a
limited extent, by the imposition of such restraints and re-
strictions, as a court might deem equitable under the cir-
cumstances.    Does not the whole include every part?    The
rule of conduct for the court was prescribed in the statute
in these words: "May make all such orders with refer-
ence thereto as may be deemed equitable."    Is not the
ascertainment and determination of what is equitable more
of a judicial than legislative function?    A very similar au-
thority and power is conferred upon the courts of this
state in reference to railroad crossings.    Where one railroad
company, desiring to lay its track across the track of an-
other, is unable to agree upon the mode and manner of ef-
fecting the crossing, a suit in equity may be prosecuted in
the circuit court for the determination of what?    Not whether
there is a right to cross.    That, the legislature has solemnly

ordained. It is for the purpose of determining what, under the peculiar circumstances of the situation, is equitable and just between the parties, as to how the crossing shall be made, and amounts to a restriction of the grant, by the imposition of such conditions as are just and equitable under the circumstances, the ascertainment of which belongs more properly to the judiciary than to any other branch of the government. Is it anything more than is done by the statute, enforcing the power of eminent domain? The fitness of a court, for determining what is a public use and what is just compensation for property taken, was so apparent that it did not occur to the framers of the constitution, that there was necessity for authorizing the legislature to make such a reference to it. It was merely assumed that such a reference would be the natural disposition of it, for the proviso, not the body of the section, requires the compensation to be fixed by a jury of twelve freeholders, if demanded by either of the parties. In the *Norwalk Case*, one member of the court dissented and filed a vigorous opinion which seems to me to show that the decision is against the great weight of authority as well as reason. He says: "It was undoubtedly competent for the general assembly to grant this franchise, and to guard against its improper exercise by giving the city supervisory powers. It was equally within its appropriate domain to grant an appeal to some suitable tribunal for any unreasonable conditions which the city might impose. * * * I think, however, that the appeal to Judge Hall may fairly be regarded as a judicial proceeding, calling for the exercise of judicial power. He was bound to dispose of it in accordance with the fundamental rules of law. * * * A difference of opinion between a municipal corporation and private corporation as to what is a reasonable use of a legislative franchise affecting the public highways, which difference must be settled before the franchise can be used at all, seems to me to present a case which it is eminently proper to place within the jurisdiction of a court. * * * Had the general assembly authorized a railway company, whose plan of construction, though duly submitted to the city authorities, had neither been approved nor disapproved, to apply to the superior court for a *mandamus* to compel them to

.act, there could have been no objection to such a remedy.'' This view as to legislative power has been expressed by this Court in *Armstrong* v. *County Court*, 54 W. Va. 502. A conclusion, exactly the opposite of that announced by a majority of the court in the *Norwalk Case*, was declared in *Zanesville* v. *The Zanesville Telegraph and Telephone Co.*, 64 Ohio 67, 52 L. R. A. 150, mentioned by Judge Miller, in construing a very similar statute. The sixth and seventh points of the syllabus, conforming exactly with the views I have hereinbefore expressed, read as follows: ''Telephone companies, organized under the laws of this State, have the right, by virtue of sections 3454, 3461-1, and 3471 of the Revised Statutes, to construct their lines along the streets and public ways of municipal corporations, in accordance with the order of the probate court, made in pursuance of section 3461, directing in what mode the lines shall be so constructed, when the municipal authorities and the company fail to agree, or the former unreasonably delay to enter into an agreement with the company. The power to make such order, as provided in section 3461, is not inappropriately conferred on the probate court, and that court has complete jurisdiction of a proceeding instituted therein in conformity with that section. The provision is not obnoxious to the Constitution of the state, on the ground that the power it confers is distinctively legislative or administrative, but is constitutional and valid.'' The statute in that case said: ''And if they cannot agree, or the municipal authorities unreasonably delay to enter into any agreement, the probate court of the county, in a proceeding instituted for the purpose, shall direct in what mode such telegraph line shall be constructed along such street, alley, or public way, so as not to incommode the public in the use of the same.'' In reaching this conclusion the court quoted and applied, from the opinion of Judge Selden, in *Cooper's Case*, 22 N. Y. 84, the following, which seems to me to assert the true principle: '' It is certainly clear as a general rule, that whenever the law confers a right, and authorizes the application to a court of justice to enforce that right, the proceedings upon such an application are to be regarded as of a judicial nature.'' Proceeding, the Ohio court says: ''It is competent for the state,

through its legislative department, to grant to telephone and telegraph companies organized under its authority the right to construct their lines in the streets of municipalities, and in the present instance the grant was so made.  The inability or failure of the council to come to an agreement with the company in regard to the mode of using the streets for that purpose practically amounts to a denial of the company's right, the remedy for the enforcement of which is that provided by section 3461, Rev. Stat.  The administration of that remedy does not involve the exercise of any continuing supervisory powers over the municipal or telephone corporation, nor the adoption or execution of administrative regulations for the government of either, but consists of an order made by the court in the usual manner of legal proceedings, after a hearing of the allegations and evidence of parties who are brought before the court by proper process."

The Milwaukee case holds unconstitutional a statute very similar to ours, providing for the incorporation of municipal corporations, conferring upon the court power in the following terms:  "If the court after such hearing shall be satisfied of the correctness of any such survey or re-survey and census, that all the requirements of the statute have been complied with,  *  *  *  it shall make an order declaring that such territory, the boundaries of which shall therein be set forth by courses and distances, and which may be enlarged or diminished by such court from the boundaries specified in such application, as justice may require, shall be an incorporated village by the name specified in such application, or by such other name as the court shall deem proper, if the electors thereof shall assent thereto as herinafter provided."  JUDGE MILLER very well says this case is contrary to the weight of authority.  It would be a useless consumption of time and waste of energy to point out and enumerate the numerous decisions which stand against it.  They propound the doctrine which I have stated, and the vice of that decision lies in its departure from those principles.  All the other cases cited by JUDGE MILLER on this question affirm the principles I have stated.  Hence, it becomes unnecessary to analyze them.  The *Norwalk* and *Milwaukee Cases* are plainly exceptional, stray,

isolated, sporadic and indefensible decisions, such as may be found occasionally standing against a host of well considered cases, enunciating almost any proposition of law. I say this with the utmost deference to the learned judges who delivered the opinions in those cases, feeling it to be my duty, not to attempt to distinguish where there is no distinction, nor to attempt to reconcile, where reconciliation is impossible. Such attempts always tend to unsettle the law, and mislead.

I have discussed, analyzed and illustrated this general principle, sustained by the great weight of authority throughout this country, at this great length, because it is the principle by which the validity of the legislative act, under which the circuit court of Mason county acted, in amending the charter of the town of Point Pleasant, must be tested. If the legislature granted the power to the town of Point Pleasant, as well as to all municipal corporations in the state, and not merely to the circuit court authority to grant the power on behalf of the legislature, then it stands upon the same footing as the power conferred upon the court in respect to the organization of municipal corporaations. If it did, it was the legislative grant of power to the corporation that effected the amendment, not the action of the court, just as in the case of the organization of such corporations, and the function performed by the court was a mere judicial function, or a ministerial function, involving judicial action as an incident thereof. The act provides for alteration, change or amendment of the charter of any city, town or village, containing a population of less than two thousand, on the application of any five or more freeholders thereof, filed, in the form of a petition, in the circuit court of the county, stating clearly the object of the petitioners, and setting forth accurately the proposed amendments, as well as any other facts, necessary to enable the court to decide whether the alteration, change or amendment shall be made as proposed. Upon the filing of the petition, the court is to enter an order in the chancery order book, stating the object of the petitioners, a copy of which order, attested by the clerk, must be posted at the front door of the court house and published in a newspaper, if one be published in the city, town or village, and if not,

it shall be posted at four public places in the city, town or village. Provision is then made for remonstrance by any of the freeholders of the city, town or village, and for the taking of depositions and affidavits to enable the court to decide whether or not the prayer of the petitioners shall be granted. The court is vested with full power to reject the prayer of the petitioners, and if no answer is filed the court may, upon the petition alone, grant the relief prayed for or the object sought to be obtained and have such orders entered, certificates made and other acts done as may be necessary to enable it to decide the case fairly upon its merits. Section 5 reads as follows: "If the court grants the amendment or amendments prayed for, it or they shall be written out in full in proper form; shall be signed by the judge of said court, and attested by the clerk, and recorded in the chancery order book of the court, and, if not inconsistent with the laws of this state, shall become part or parts of the charter of such city, town or village."

It is difficult to conceive any language better calculated to give, by way of amendment, the broadest powers that the legislature could give, consistently with existing laws. The amendment is not confined, by the language of the statute, to any particular kind or class. It gives power to alter, change or amend the charter. A later section assumes that the court may grant not one amendment, but amendments. Another section implies that the object of the petition may be something other than the enlargement or diminution of the boundaries. In order to give it any effect, we must say the statute was intended to give power of amendment in respect to something other than the addition of territory, or change the boundary lines, because chapter 47 in section 48 thereof, had already made ample provision for that, and the act of 1877 did not expressly repeat it, and it has since been carried along in that chapter as a part of it. That section 48 of chapter 47, antedating the act of 1877, and the act of 1877 were intended to operate together and to be harmonized, is made plain by the incorporation of the act of 1877 into chapter 47 as section 47a thereof. It is not limited to the matter of amendment respecting boundaries. Its scope is defined by the fifth sec-

tion of the act of 1877, which says that the amendment or amendments so made shall become part or parts of the charter, if not inconsistent with the laws of this state. What does the letter of this language of the statute import? Plainly that a municipal corporation of the class named has the right to amend its charter, so as to give itself any power, no matter what, that the legislature itself could give, provided it be not inconsistent with some law of the state. To this extent, it is a wholesale grant of power to municipal corporations of that class. It is not a grant to the court of power to amend any more than the grant of a right to be a corporation is a grant of power to the court. The court is not authorized to take the initiative. It cannot move in the matter except upon application of five or more freeholders of the corporation. It has no discretion to grant but only to refuse. It sits to determine among other thngs whether the amendment asked for is inconsistent with the laws of the state. Is not that one of the functions of a judicial tribunal? It is the only tribunal authorized by the law to determine what is, and what is not, law. If it is not inconsistent with law, that the petitioners are *prima facie* entitled to the relief asked, may be the correct view to take, but this may be overthrown by the action of the remonstrants, in showing it to be against the will of a majority of the voters or freeholders, or in disclosing some peculiar conditions, making the power asked oppressive, unjust or demoralizing to the community, just as in the case of an application for a certificate of incorporation. Courts must construe statutes so as to make them effective, if possible. They cannot fold their arms and say a statute is void, merely because they do not readily, and at first blush, see what the legislature intended. They must seek out the intention and carry it into effect as far as possible. Does it require any imagination to see that this discretion is the same kind as that conferred in reference to original incorporation? Are there not normal and abnormal conditions to be considered here as there. Cannot a court distinguish between them? Is the grant of the right of amendment and alteration, so made to municipal corporations, upon the conditions annexed to the grant, unconstitutional because it is

a wholesale grant, because the powers so granted are not enumerated and specifically defined? Is a power of attorney void, on the ground of uncertainty or otherwise, because it gives to the attorney the power to do all things which the principal himself could do? Practically all powers of attorney are drawn in that form. Is not that certain which can be made certain? When the legislature says that a municipal corporation may have, by way of amendment to its charter, any power and all powers, not inconsistent with law, where is the element of uncertainty in the grant? There is a right of election, for it is not to be assumed that any one corporation would want, or could exercise, all powers, not inconsistent with general laws, but this does not make the grant uncertain. If one man sell to another any or all of the horses in a certain field, as the vendee may elect, or of a certain breed or color in such field, at a certain price per head, the contract would be an absolutely good one. So here, the powers granted are designated and defined in a general way. They are all the powers, not inconsistent with general laws, which the legislature could grant to a corporation, if it could legislate specially for such corporation, and the corporation may, upon election, and compliance with the conditions annexed, take any of them they desire. This is the proposition decided by the Mississippi cases, cited in JUDGE MILLER's opinion, And JUDGE MILLER very truly and properly says the Mississippi case did not involve the question of imposing legislative duties upon the court. If there was any legislative duty or delegation of legislative powers in it, the duty was imposed upon, or the delegation made to the governor or the attorney general, executive officers, representing the executive department, and the Constitution as emphatically inhibits such delegation to the executive department as it does to the judicial department. It says the three departments shall be separate. It is plain, therefore, that there was no delegation of legislative power, either to the judicial, or the executive, departments. There was no such delegation at all. It was a legislative grant of power, upon condition, made direct to the corporation or the people, which is not important. And the only function performed by the governor or attorney general was a

mere ministerial one, involving the incidental exercise of discretion, a matter which belongs to all three of the departments. The Mississippi case not only sustains the position that there is no delegation of legislative power involved, but the further position that the wholesale grant of powers so made by the statute is not void for uncertainty or for want of enumeration, specification and minute definition of each power so granted. The provision of the Mississippi constitution was in substance the same as that of our constitution. It did not reserve, independently of legislative action, to the people of any community the right to incorporate and take unto themselves all such corporate powers as were not inconsistent with general law, as does the California constitution, which has been sustained as valid by repeated decisions of that state. It authorized the legislature to pass general laws .for the incorporation of municipalities and the amendment of their charters, just as our constitution does. The legislature in passing this general law, imposed upon the attorney general and governor, the duty which our statute, made for the purpose of carrying into effect the same kind of a constitutional provision, has imposed upon the circuit courts. If the Mississippi court had seen in this statute an attempted devolution, upon the executive department, of legislative power, it would have declared the statute void for that reason. It sustained the statute,. because there was no such devolution, and ours must be sustained, so far as that matter is concerned,· because there is no such devolution. It sustained the statute, notwithstanding it made a wholesale grant of powers, because it was not in violation of any principle of law of which the court had any knowledge, and ours must be sustained for the same reason. It cannot be overthrown for some supposed reason which the court cannot define or state. The wisdom of such action on the part of the legislature is not a question for judicial determination. Courts have nothing to do with the wisdom or policy of legislative action, as has been shown by authorities cited at the outset of this opinion. Such legislation may be unwise and impolitic, but it cannot be overthrown by the courts for that reason. " The courts have no right to set aside, arrest or nullify a law passed in relation to a subject within

the scope of legislative authority, on the ground that it conflicts with their notions of natural right, absolute justice or sound morality." *Slack* v. *Jacob*, 8 W. Va. 612, (syl. pt. 5.)

Something has already been said concerning the intention of the legislature in making this conditional grant of power to municipal corporations by way of amendment to their charters. JUDGE MILLER assumes that the amendment must not be inconsistent with chapter 47 of the Code. He says so. His argument is that chapter 47 of the Code is a law of the state, which is true, and as the amendment, in order to be effective and valid, must not be inconsistent with the laws of this state, it must not be inconsistent with chapter 47. This view, it seems to me, ignores or overlooks the important consideration that the statute, granting these amendments, is a part of chapter 47, which makes it impossible for any such amendment to be inconsistent with that chapter. In other words, chapser 47, embodying as a part of it, the act of 1877, confers, *proprio vigore*, certain powers upon municipal corporations, constitutes the charter of these corporations, and then says it, (chapter 47,) viewed as the charter of the corporation, may be altered, changed or amended, in any respect to any extent, not inconsistent with the laws of the state. In other words, it says chapter 47 itself, being the charter of every corporation organized under it, may be altered, changed or amended in any manner, not inconsistent with law. What else is there but chapter 47 to change, alter or amend? Nothing. If it cannot be altered, changed or amended, then the provision allowing amendment becomes a dead letter. Courts cannot kill statutes in any such manner, How can any amendment be inconsistent with the provisions of a chapter which gives such power to amend? When a corporation is organized under chapter 47, the provisions of that chapter constitute its charter, and that charter says the corporation may have any power not inconsistent with the general law which the corporation may see fit to claim or elect to take, by way of alteration, change or amendment of its charter—its charter, chapter 47 itself, the only charter it has. This was not true of the town of Point Pleasant at the date of the amendment of

its charter, because it had not been incorporated under chapter 47. It was chartered by special act of the legislature of 1794, and its charter was amended by special act of the legislature in 1860, but the additional powers given to corporations of its class by chapter 47, were conferred upon it by that chapter. But this act of 1877 was applicable to said town in 1877 and 1883, because it then belonged to the same constitutional class of corporations, having less than two thousand population. To say this statute, granting amendments to the charters of municipal corporations of that class, contemplates no amendment inconsistent with chapter 47, makes it, I repeat, a nullity. It would be impossible to amend it in respect to the number of its officers or their powers and duties, or terms of office, for any change in any respect would be inconsistent with that chapter, except in a few instances in which it authorizes specific changes, such as increasing the number of wards and number of councilmen, consistently with the growth of the town. The alteration might be in respect to powers to pave streets, pave side-walks, put in sewers and a vast number of other things not bearing any relation to the liquor traffic. It is an important statute, the principle of which must be upheld in some form to enable the legislature to execute a power and duty, enjoined upon it by the constitution. In dealing with it, the court must not regard it as subserving some particular purpose or interest.

JUDGE MILLER's conclusion, that the amendment must not be inconsistent with chapter 47, is predicated largely on the clause in the certificate of incorporation, prescribed by section 9 of chapter 47 of the Code, reading as follows: " And it appearing to the satisfaction of the court, that all of the provisions of chapter forty-seven of the Code of West Virginia, have been complied with by the applicants for said incorporation, and said city (town or village) is duly authorized within the corporate limits aforesaid to exercise all the corporate powers conferred by the said chapter from and after the date of this certificate." That relates to an unamended charter. On the organization of a corporation, under chapter 47, it takes the powers enumerated and defined in that chapter. That chapter is, in

one sense, the town's charter, and in another, a genera-
law under which other corporations may be organized. All
corporations, so organized, have those powers and no
others. Their powers are uniform. They are all put on
the same footing exactly. In the absence of any amend-
ments, each has the powers enumerated, defined and granted
by that chapter. But that chapter, as amended by the
act of 1877, gives · to each of these corporations, on its or-
ganization certain powers, and the additional power to claim
and take by election other powers, additional powers, and to
eliminate, by change and alteration, some of the powers
given by chapter 47, and the principle of the amendment is
the same as the principle under which the organization is ef-
fected in the first instance. It stands upon a grant of
power direct from the legislature to the corporation or the
people thereof, to become effective upon the performance
of certain conditions. These other additional and different
powers do not go to the corporation at the inception of its
existence. It was competent for the legislature to have
given them all in the first instance, if it had seen fit to do so,
and, while the court may see no particular reason why
it should not have . authorized them in the first in-
stance, as did the legislature of Mississippi, it is the
province of the legislature, and not of the court, to say
whether it shall be so done or not. As the legislature
has said that a corporation shall begin its existence with
certain specific and clearly defined powers, and make such
changes thereafter as it may see fit to make, provided these
changes do not contravene any of the general laws of the
state, the courts must allow the statute to operate accord-
ing to the intention of the legislature. It was a mere matter
of expediency and public policy with which the courts have
nothing to do.

The argument of· JUDGE MILLER seems to rest also upon
the idea that the constitution, by implication or otherwise,
requires all municipal corporations of less than two thou-
sand population to have uniform charters. I have found
nothing in the constitution which expressly says so, nor is
there anything in it, or the circumstances under which it
was adopted, from which such an implication can arise. At
the date of the adoption of the constitution, there were

numerous towns and villages in the state, falling in that class, holding charters granted by special acts of the legislature and widely differing in the powers conferred. All these charters were continued in force. Not one of them was annulled. The constitution, therefore, recognized and sanctioned, by implication, lack of uniformity in the charters of such corporations. Section 39 of Art. VI. forbidding the passage of special laws for the incorporation of cities, towns or villages, or amending the charter in any city, town or village, containing a population of less than two thousand, and enjoining upon the legislature the duty of providing, by general laws, for these and all other purposes, for which provision can be made, does not say that the general law shall be uniform in operation as well as general. The requirement that the law be general does not imply that it be uniform in its operation and effect in the full sense of the terms. *State* v. *County Court of Braxton Co.*, 55 S. E. 382. But, if it did, is not this statute, conditionally granting amendments, uniform in its operation? It makes exactly the same grant to every corporation in the state falling within that class. It makes a conditional grant to each, and every one of them, the right to change its charter in any respect not inconsistent with the laws of the state. It does not force this change upon any corporation. It makes it a matter of election with the corporation or rather the freeholders. In so far as the act is carried into effect by the action of the legislature, it is both general and uniform. It stands on exactly the same footing in this respect as the provisions of chapter 47, giving the right to incorporate. Those provisions extend to the inhabitants of every one quarter of one square mile of territory in the state, having a population of not less than one hundred persons. the right to be a body politic and corporate; and these provisions are not defeated for want of uniformity or generality, because the inhabitants of some of these territories, having the requisite population, see fit to incorporate and others do not. Viewed in the abstract, it is both general and uniform, as in every other general law, such, for instance, as the law of inheritance. Viewed in the concrete, it is uniform and capable of becoming general, just as other general laws, operating prospectively. The purpose

and object of the clause of the constitution, above referred to, has been declared by this Court to be something other than the requirement of uniformity in charters. Judge Holt said in *Elder* v. *Central City*, 40 W. Va. 222: "In 1872, the organization of many parts of the state into municipal corporations, for the purpose of local self-government had become a matter of frequent and urgent necessity. The framers of the Constitution thought that this need in the great majority of cases could be met more efficiently and impartially by a general law than by a great multitude of special enactments." He regarded it as a mere matter of convenience, saving time, expense and trouble. Ordinarily, the legislature is in session only forty-five days out of seven hundred and thirty, and, to compel the people of a community to wait two years for an act of incorporation would have been unreasonably burdensome. It would occasion not only delay and expense, but uncertainty, owing to the great rush of matters pressed upon the legislature in this short session, by reason of which many meritorious bills fail for want of time to consider them. Moreover, the people wanted the legislature relieved from the useless burden of labor and consumption of time, formerly bestowed upon these charter bills, to the end that the body might have more time for the consideration of general laws and such special laws as were necessary for which general laws could not be substituted. In the case of *Town of Union Mines*, 39 W. Va. 179, Judge Dent, speaking for the Court, said: "But the Constitution, to relieve the legislature from being hampered with this inquiry in every case, requires the legislature to enact a general law for the incorporation of all cities, towns and villages of less than two thousand inhabitants." If every amendment made by the legislature by general law had to be carried into the charter of every corporation of that class, this plain object of the constitutional provision under consideration would be defeated; for every proposed amendment would then bring to the legislature the representatives of every municipal corporation in the State, belonging to the class named and give them the right to be heard; for it would become part of the charter of every such corporation. Instead of minimizing the work of the legislature and simplifying

its mode of dealing with these corporations, it would complicate the matter and add to the legislative burdens. Such a construction of the provision would defeat the very thing this Court has declared to have been its purpose. It would make the provision a *felo de se*. In view of these important considerations, amply justifying and vehemently calling for the ·insertion of this clause in the constitution, ought the Court to add on a lot more of mere fanciful suggestions of reasons, and give weight to them in the construction ·of that clause, so as to make it mean what it plainly does not mean, when viewed in the light of conditions which were recognized and sanctioned by it and the framers of the constitution in which it is found, and such in character as to defeat what has been declared to be its object? If lack of uniformity in municipal corporations of this class was regarded by the people as an evil which they desired to eradicate, is it not strange that, having the power to annul all the special charters then existing, differing from one another even more than one star differs from another, they did not do so, but, on the contrary, expressly declared that all these laws in force at the adoption of the constitution should remain in force until altered by the legislature? Matters of this kind, bearing on the question of intention, are not fancies, conjectures or surmises. They are stubborn facts, not to be off-set, nor the inferences arising from them overcome, by groundless suggestions of other considerations.

To me, therefore, it is perfectly clear that, by the amendment in question, the council of the town of Point Pleasant acquired the sole power to grant or refuse licenses of all kinds, unless the exercise of that power would have been inconsistent with some law of the state other than any provision of the constitution to which attention has been directed, and other than chapter 47 of the Code. Whether it is or not, I have no occasion to inquire, since my declared purpose in writing on this branch of the case is now fully accomplished, namely, the statement of reasons for neither concurring in certain views, expressed by JUDGE MILLER, nor allowing them to pass unchallenged. Whether the amendment made by the circuit court in 1883 is inconsistent with any law of the state is not a constitutional ques-

tion, but one of legislative intention, to be ascertained from a view of the statutes.

As chapter 40 of the acts of 1891 clearly vested, in the council of the town of Point Pleasant, sole power to grant licenses for the sale of intoxicating liquors, the license granted by it to the defendant Harden was valid. In holding it invalid, the circuit court of Mason county. erred, and as the validity of his license is the only question in the case, this conclusion not only reverses the judgment and sets aside the verdict, but finally disposes of the case, under the operation of a rule lately declared by this Court in *Ruffner Bros.* v. *Insurance Co.* and other cases.

*Reversed.*

BRANNON, JUDGE, (*concurring*):

I think the act of 1891 gives the Council power to grant license. I can assign no other meaning to that act. It is that which leads me to concur in the decision.

MILLER, JUDGE, (with whom concurred McWHORTER, JUDGE), *dissenting:*

I concur in the proposition, announced in the majority opinion, that the legislature has authority to confer upon municipal corporations sole power to grant or refuse license to sell spiritous liquors within their corporate limits, this Court being committed to that proposition, by prior decisions construing our Constitution. But I can not concur in the conclusion reached that the legislature, in exercise of this authority, has ever directly or indirectly, or by delegated authority to the circuit court of Mason county, conferred upon the town council of Point Pleasant such sole power.

The opinion attempts to justify this conclusion upon three propositions: First, that the title and substantive provisions of the act of 1891 evince a purpose on the part of the legislature of "making a complete law for the government of the town of Point Pleasant and fully defining its powers," so that it might not thereafter be necessary to look to the provisions of the act of 1794 or of 1860, or to any provision of chapter 47 of the Code, but to the provisions of the act of 1891 alone, to ascertain the limits of the powers and

duties of said corporation; second, that section 35 of said
act of 1891, authorizing the council to prescribe by ordi-
nance "the manner in which licenses of all kinds shall be
applied for and granted" and to "require the payment of
the tax thereon before delivery to the person applying
therefor," was intended to be and in fact was a substituted
provision for section 32 of the act of 1860, which provided
that "whenever anything for which a state license is re-
quired is to be done within the said town the council
may require a town license to be had for doing the
same, and may impose a tax thereon for the use of the town;
and the council may, in any case in which it sees fit, re-
quire from the person so licensed a bond, with sureties, in
such penalty and with such condition as it may think proper",
and that this substituted provision, considered in the light
of the title and other substantive provisions of the act of
1891, must be construed to confer upon the council sole
power to grant liquor licenses; third, that, whether or no
the second proposition be correct, the proceedings and order
of the circuit court of Mason county of 1883, by which
that court undertook to confer upon the council of said town
sole power to grant such licenses, was competent to do so,
and, whether it was or not, section 40 of the act of 1891,
the repealing clause of that act, providing that it "shall not
be construed to appeal, change or modify any previous act
not inconsistent with this act authorizing said town to contract
debts or borrow money, or to take away any of the powers
conferred upon said town or upon the mayor or council or
any of the officers thereof conferred by general law, or any
amendment of its charter heretofore made by the circuit
court of Mason county, except so far as the same may be
inconsistent with the powers hereby conferred," must, in
order to effectuate the alleged intendment of the legislature
to create a complete organic law for said town, be converted
into a positive enactment, by the general reference there
made, conferring sole power upon the council of said
town to grant liquor licenses.  As I understand the opinion,
the last proposition stands alone upon the views of JUDGE
POFFENBARGER, who prepared that opinion, the other judges
not concurring therein.

On the first proposition, it may as well be said of the act

of 1794 and of 1860 as of the act of 1891 that they evince a purpose on the part of the legislature to create a complete organic law for the government of said municipality; but neither invested the council with the sole power to grant licenses to sell spiritous liquors. The argument, it seems to me, is based on the false assumption that a complete organic law for the government of the municipality necessarily requires and implies sole power to deal with liquor licenses, state as well as municipal, a *non sequitur*. Sole power to grant licenses has been conferred upon few municipalities of the state; but all are empowered, either by special provision of their charters or by the general provisions of section 33 of chapter 47 of the Code, to require a municipal license and impose a tax thereon when anything for which a state license is required is to be done within the municipality. By the repealing section of the act of 1891, such powers conferred by general law were specially reserved to the town of Point Pleasant. I am unable therefore to appreciate the force of the argument, and of the illustrations drawn from the decisions referred to, on the first proposition. It seems to me the decisions and authorities referred to have very remote, if any, application to this branch of the subject.

The second proposition, it seems to me, is the one mainly relied upon in the opinion of the Court, the one on which the concurring judges have mainly united. It rests principally upon the assumption that section 35 of the act of 1891 was intended to confer upon the council, not by express terms but by implication, sole power to grant licenses to sell spiritous liquors—a substitute, as I have said, for section 32 of the act of 1860. The opinion of the Court discloses in part the position in which this section 35 stood in the act as it was originally introduced in the legislature. In the bill as introduced, it originally stood as section 37, section 35 then prescribing the things for the doing of which the council should have power to grant and revoke licenses, and section 36 providing for the taking of bonds from persons licensed to sell spiritous liquors. These sections are quoted in full in the opinion of the Court. By reference to the original section 35 it will be seen that it did not confer upon the council the sole power to grant licenses to sell

spiritous liquors, and the purpose of it was solely to authorize the council to impose a tax thereon for municipal purposes. After the effort was made to amend section 35 so as to invest the council with sole power on the subject, the result, as shown by the journals of the legislature, was that *both this section and section 36 were stricken out, thereby eliminating the only provisions of the act directly conferring upon the council power to grant licenses for any purpose.* After these sections were thus eliminated, original section 37 was made, without change, section 35 of the act as finally passed. It is clearly to be seen that this section, read in connection with the two so eliminated, was not intended to confer any power to *grant* licenses for any purpose, but, by its very terms, it only authorized the council to prescribe by ordinance the *manner* in which licenses should be applied for and granted, and certainly, as originally proposed, related solely to licenses for municipal purposes. But now the argument is that, the sections specially conferring power to grant licenses to the municipality having been stricken out, that section, which was intended to authorize the council to prescribe the *manner* in which licenses for municipal purposes should be applied for and granted, must be so construed as to give *sole power and authority over the whole subject of license taxes, state and municipal.* In my opinion, neither its original place in the bill as proposed nor its terms will admit of such construction.

But it is argued that, without this section is thus construed, it will be left meaningless. I do not think so. It may still be given full force and effect, and made to execute its original purpose. What are we to conclude from the action of the legislature in striking out said sections 35 and 36? That the legislature intended thereby to deprive the municipality of all power to grant and revoke licenses. By no means. Power is fully conferred by section 33 of chapter 47 of the Code—reserved, if that were necessary, in the repealing section of the act of 1891. Concededly that section of the general law is as much a part of the organic law of the municipality of Point Pleasant as if it had been bodily inserted in the place of the two sections stricken out of the act of 1891. If we read this section of the general

law into that act, as we must, then every provision of said section 35 as it now stands, relating to the *mode* of obtaining licenses, may be given full force and effect; and this is plainly the effect which the legislature intended it should have.

That said section 35 conferred any such authority as is now claimed for it was not even suggested upon the original hearing. The sole ground of defense then was that, by the proceedings and order of the circuit court of Mason county in 1883, the council had been invested with sole power to grant licenses for state and municipal purposes to sell spiritous liquors within the corporate limits. This brings me to the third and last proposition. I make the same answer to it now as I made then.

Our Constitution of 1872, section 35, Article VI., provides that "the legislature shall not pass local or special laws in any of the following enumerated cases; that is to say, for * * incorporating cities, towns or villages, or amending the charter of any city, town or village, containing a population of less than two thousand. * * The legislature shall provide, by general laws, for the foregoing and all other cases for which provisions can be so made; and in no case shall a special act be passed, where a general law would be made proper and can be made applicable to the case, nor in any other case in which the courts have jurisdiction and are competent to give the relief asked for." After the adoption of the Constitution of 1872, the legislature by sundry acts amended, improved and re-enacted chapter 47 of the Code, so as to render it general law for the incorporation of cities, towns and villages. Section 1 of that chapter provides: "The cities, towns and villages in this state, heretofore established under the laws of Virginia or of this state, shall remain subject to the law now in force and applicable thereto respectively, and the provisions hereinafter contained in this chapter shall be deemed applicable only to cities, towns and villages hereafter established, except that the municipal authorities of cities, towns or villages heretofore established other than the city of Wheeling may exercise the powers conferred by this chapter, although the same may not be conferred by their charter, and so far as this chapter confers power on the municipal authorities of a city,

town or village other than said city of Wheeling, not conferred by the charter of any such city, town or village, the same shall be deemed as an amendment to said charter. Any city, town or village in this state, incorporated by a special act of the legislature of Virginia or of this state, and exercising the power conferred by this chapter, may by ordinance of the council of said city, town or village adopt this chapter, and thereafter the same officers shall be elected or appointed as are provided for by this chapter." Section 28, relating to the powers and duties of the council, provides that the "council of such city, town or village shall have power ** to prevent the illegal sale of all intoxicating liquors, drinks, mixtures and preparations therein." And section 33, relating to licenses, provides: "Whenever anything for which a state license is required is to be done within such city, town or village, the council may require a city, town or village license therefor, and may impose a tax thereon for the use of the city, town or village. But no license to sell, offer or expose for sale any brandy, whiskey, rum, gin, wine, porter, ale or beer, or any intoxicating liquor, drink, mixture, or preparation whatever within such city, town or village, or within one mile of the corporate limits thereof, unless it be within another incorporated city, town or village, shall be authorized or granted except as provided in chapter thirty-two of this Code." Section 47 reads: "No special act shall be passed incorporating or amending the charters of any city, town or village containing a population of less than two thousand, but the incorporation of all such cities, towns and villages and the amendment of the charter thereof shall be as now is, or shall hereafter be, provided by general law."

By chapter 78, acts of 1877, the legislature undertook to provide by general law for amending charters of cities, towns and villages, imposing the duty upon the circuit court. The six sections of this act are now incorporated in chapter 47 of the Code as sections 47a I., etc. It was pursuant to the provisions of this act, no doubt, that the circuit court of Mason county in 1883 proceeded to amend the charter of the town of Point Pleasant. By act of 1891, said town having increased in population beyond the two thousand limit, the legislature amended its

charter as already shown. When the license court, therefore, undertook to grant the license to Joseph Varian in April, 1905, it proceeded upon the supposition that, by the amendment of its charter in 1883 and by virtue of sections 10, 11, 12 and 13 of chapter 32 of the Code as amended by the acts of the extraordinary session of 1904, then in force, it was authorized, without the consent of the county court to grant said license. If, therefore, the amendment of the charter in 1883 was a valid act and vested in the council the sole power to grant licenses, Varian's license protected Harden, the agent of Varian, and he is not guilty of the offense charged; otherwise, he is. Such authority was not conferred on the council of said town, by implication, by the repealing clause of the said act of 1891 providing that the said act should not be construed to take away any of the powers conferred by any amendment of its charter heretofore made by the circuit court; for if the circuit court was without jurisdiction to amend, the proceedings of 1883 conferred no power, and there was no such power to protect.

Let us inquire at this point what were the powers which the legislature intended to confer upon the circuit court by chapter 78 of the acts of 1877. The original power conferred upon the circuit court by chapter 47, after hearing the application and supervising the proceedings directed by the previous sections, is by section 9, by an order entered of record, to direct the clerk of said court to issue a certificate of incorporation in form and substance as follows: "A certificate under oath of A. B., C. D. and E. F. was this day filed, showing that a majority of all the qualified voters residing in the following boundary, towit: beginning etc., have been given in due form of law in favor of the incorporation of the town of —— in the county of ——, bounded as herein set forth. And it appearing to the satisfaction of the court that all the provisions of chapter forty-seven of the Code of West Virginia have been complied with by the applicants for said inncorporation, *the said town is duly authorized within the corporate limits aforesaid to exercise all the corporate powers conferred by the said chapter from and after the date of this certificate.*" The words of the certificate underscored by me are significant. They show that

when such charter is granted to an incorporated city. town or village the limits of its authority are defined by the provisions of chapter 47. In this connection we direct attention to that clause of section 3 of chapter 78, acts of 1877, as follows: "If the object of the petitioners is to enlarge or diminish the boundary of such city, town or village, such answer may be filed by one or more freeholders residing upon or owning the territory proposed to be annexed to or included in the corporate. limits of such city, town or village;" and to the clause of section 4 of the same act as follows: "If no answer is filed as aforesaid, the court may upon the petition alone grant the relief prayed for or the object sought to be attained; and the court is vested with authority to have such orders entered and such surveys made and other acts done as may be necessary to enable it to decide the case fairly upon its merits." Attention is also directed to the provision of section 5 of that act, directing recordation of the amendments in the chancery order book of the court, and providing that "they, if not inconsistent with the laws of this state, shall become part or parts of the charter of said city, town or village." Is it not apparent from these provisions that the authority given the court to amend a municipal charter is limited to amendments of these provisions of the charter which it is authorized in the first instance to grant, viz. those relating to the boundary of the territory included, the name of the town, and the like, and not to enlargement of the powers of the municipality prescribed by the original charter or in the general law? By section 5 of said chapter 78, it is only when the amendment of the circuit court is not inconsistent with the laws of this state that it becomes part or parts of the charter granted. Is not the amendment of 1883, which the circuit court undertook to enact, inconsistent with chapter 47 of the Code, with the provisions of section 39 of article VI. of the Constitution, and with the general policy of the law that no special charters or privileges shall be granted to cities and towns with a population under two thousand? If this be true—then, by the very terms of the act under which the circuit court proceeded, such inconsistent provision could become no part of the charter. I am clearly of the opinion that the limit of the power the legislature

intended to confer upon the circuit court by the act of 1877 is confined, and was intended to be confined, to amendments embraced within the scope of the charter which such court is by chapter 47 authorized to grant. Certainly it was never intended to confer upon the circuit court by that act power at will to amend any and every provision of the general law or of the charter powers prescribed by previous special acts of the legislature.

But, suppose it was so intended, such attempted imposition by the legislature of its functions upon the judicial branch of the state government would be abortive and fail of its object. While it is true that by section 12 of article VIII. of the constitution prescribing the jurisdiction of the circuit court, it is provided that they "shall also have such other jurisdiction, whether supervisory, original, appellate or concurrent, as may be prescribed in law," yet such general jurisdiction must necessarily be confined to matters judicial or *quasi* judicial, and not extended to strictly legislative acts. Chapter 78 of the acts of 1877 has never as yet been interpreted by this Court; but at least two cases have interpreted the provisions of chapter 47 conferring upon the circuit court authority to grant municipal charters.

In *Elder* v. *Incorporators of Central City*, 40 W. Va. 222, it was held that "chapter 47 of the Code, in relation to the incorporation of cities, towns and villages, in so far as it confers on the circuit court functions in their nature judicial and administrative, although in furtherance of the power of the legislative department of the state government, is constitutional and valid." But, says that opinion: "This statute itself erects the local body of citizens into a municipal corporation upon their bringing themselves within its provision and upon complying with its terms, all of which are specific and fixed therein; and whether the facts thus required exist in the particular case the circuit court, after due notice to all concerned and an opportunity to be heard against the application, ascertains and determines. This is, at least an administrative or *quasi* judicial function, which the circuit court may be authorized to perform."

In *In re Town of Union Mines*, 39 W. Va. 179, the first

point of the syllabus is similar to that in *Elder* v. *Incorporators* quoted above. In speaking of the last clause of section 12 of article VIII. above referred to, JUDGE DENT at page 182 of this case says: " This does not authorize the legislature to confer or impose on the circuit court any of its functions which are strictly legislative, but only such as are in their nature judicial and administrative, and which by the constitution it is forbidden longer to exercise but is required to direct by general law how and by whom they shall be discharged"; citing *Shepherd* v. *Wheeling*, 30 W. Va. 479, and other West Virginia cases.

These decisions limit the legislature in the delegation of such power to those which are properly described as administrative or *quasi* judicial. The doctrine stated by JUDGE DENT in *In re Town of Union Mines*, *supra*, that the legislature may not confer or impose upon the circuit court any of its functions which are strictly legislative, but only such as are in their nature judicial and administrative, is in accord with the weight of judicial opinion. *Zanesville* v. *Zanesville*, 64 Ohio 67, (52 L. R. A. 150); *Norwalk Street Railway Company's Appeal*, 60 Conn. 567, (39 L. R. A. 794;) *State* v. *Gerhardt* (Ind.), 33 L. R. A. 313; *In re Application for Incorporation of North Milwaukee*, (Wis.), 33 L. R. A. 638; *Forsyth* v. *Hammond*, (Ind.), 30 L. R. A. 576; *State ex rel Richards* v. *Cincinnati*, (Ohio), 27 L. R. A. 737; Cooley Con. Lim. (7th Ed.) 137, 165, 173; 1 Suth. Stat. Const. (2nd Ed.) 5, 7, 9, 149, 446. Many other cases are cited in the notes and briefs of counsel in these cases. Reference to them will show with what nice distinction the general rule is applied to individual cases.

In the *Norwalk Railway Company Case*, *supra*, the public acts of 1895, giving right of appeal from the decision of the council of any city to the Superior Court, was declared unconstitutional, on the ground that the Superior Court or the judge thereof could not exercise a power which is not judicial within the meaning of the constitution.

In *Zanesville* v. *Zanesville*, *supra*, the supreme Court of Ohio says: "It is a sound proposition that the distribution of the powers of the state, by the constitution, to the legislative, executive and judicial departments, operates, by

implication, as an inhibition against the imposition upon either of those powers which distinctively belong to one of the other departments." While the court in this case sustained the constitutionality of the Ohio law, it did so on the ground that the statute of Ohio gave the legal right to the defendant telegraph company to occupy roads, streets and alleys, and provided that in event an agreement could not be effected with the municipal authorities an original suit might be brought by the telegraph company against the city or town to be affected, the legal rights of the parties tried, and orders made therein carrying those rights into effect. The distinction thus made is clearly stated in point 2 of the syllabus as follows: "The fact that a power is conferred by statute on a court of justice, to be exercised by it in the first instance in a proceeding instituted therein, is, itself, of controlling importance as fixing the judicial character of the power, and is decisive in that respect, unless it is reasonably certain that the power belongs exclusively to the legislative or executive department."

The *North Milwaukee Case, supra,* went further perhaps than most cases have gone, in condemning as unconstitutional a statute empowering a court to determine whether the lands embraced in the petition for incorporating a town ought justly to be included therein, and whether the interest of the inhabitants will be promoted by the incorporation, and giving the court power to enlarge or diminish the boundaries as justice may require. The Wisconsin court says in reference to the statute there involved: "There are a number of the questions upon which the court is required to pass when making the preliminary order of incorporation under section 861 Rev. Stat. which are unquestionably pure questions of fact. Such questions as whether the survey is correct, whether the census is correct, whether the population is as large as the statute requires in proportion to the area, and whether the statutory requirements have been complied with, are all questions of fact; and no reason is perceived why the court may not properly be authorized to inquire into and determine these facts, nor why it may not order an election and appoint inspectors. But the other questions, upon which the court is required to pass are of a different nature, and we see no escape from the conclu-

sion that in passing upon and deciding them the circuit court determines legislative or political questions. These questions are (1) whether the lands embraced in the petition ought justly to be included in the village, and (2) whether the interest of the inhabitants will be promoted by such in-, corporation. Furthermore, the provision authorizing the court to enlarge or diminish the boundaries of the village as justice may require seems to us equally the exercise of legislative power. * * Given all the facts which the legislature requires—the area, the population, the census, the map, the notices—and does the order calling an election follow? By no means. The circuit court, in addition to determining these facts, must then say, whether in its judgment, it is best that there should be a village. This is no true question of fact. It is a mental conclusion, which may be based alone on the previous bias of the mind of the presiding judge as to the expediency of a small settlement assuming corporate powers and obligations. * * This amounts to nothing more nor less than the vesting in the circuit court of the powers of a third house of the legislature, which must be exercised in the affirmative before a village can exist."

Many of the decisions referred to in the cases cited and in the briefs of counsel relate to the constitutionality of legislative acts imposing upon courts powers and duties in relation to enlarging boundaries of municipal corporations; and the weight of these authorities is, contrary to the Wisconsin case, that they constitute valid acts, being in their nature administrative and *quasi* judicial; but whenever such acts have gone further and imposed on courts matters purely legislative, they are unconstitutional and void, and all proceedings thereunder of such legislative character are inoperative.

I have found but one state where the contrary of this doctrine has been held; namely, the state of Mississippi. See *Yazoo City* v. *Lightcap*, 33 So. Rep. 949, 2 Mun. Corp. Cas. Anno. 198. This case, however, can hardly be regarded as authority against the proposition contended for. In that state the constitution provided that the legislature should pass general laws in which local and private interests should be provided for and protected, and under which cities and towns might be chartered and their charters

amended and under which corporations might be created and organized and the rights of corporations altered, and that such laws should be subject to repeal and amendment. The general law of the state provided that persons desiring to be incorporated might prepare a charter, which should contain among other things the powers to be exercised, and providing that if approved by the governor and attorney-general the powers therein specified should be vested in the corporation, and also providing that such charters might be amended and renewed in like manner. This act was held valid in the case cited and in a long line of decisions in that state; but that case did not involve the question here of imposing legislative duties upon a court.

I am therefore of opinion that the act of 1877 could not and did not confer upon the circuit court power and authority to amend the charter of cities, towns and villages, or the general law of the state, in the particular in which the circuit court of Mason county by the proceedings in 1883 undertook to amend the charter of the town of Point Pleasant; that this act of the court was and is illegal and invalid, and did not confer upon the council of the town of Point Pleasant the sole and exclusive power to grant all licenses within the corporate limits of said town; and that the license granted to Joseph Varian and involved in this case was unauthorized and void.